**<u>Exhibit B</u>**

Case 1:13-cv-01540-RWS   Document 1-21   Filed 03/07/13   Page 2 of 55

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RG STEEL, LLC,

                             Plaintiff,

                -against-

SEVERSTAL US HOLDINGS, LLC and SEVERSTAL US
HOLDINGS II, LLC,

                           Defendants.

Index No.

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

        YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer on plaintiff's attorneys within (20) days after service of this summons, exclusive of the date of service, or within thirty (30) days after service is complete if the summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

        As set forth in the Complaint, plaintiff designates New York County as the place of venue pursuant to Section 501 of the Civil Practice Law and Rules since, by a written agreement, which is the subject of this action, defendants irrevocably consented to the jurisdiction of this Court and agreed that any action seeking to enforce any provision of, or based on any matter arising out of, or in connection with, the agreement shall be brought exclusively in this Court or in the United States District Court sitting in the Borough of Manhattan.

Dated:    New York, New York
          April 20, 2012

CADWALADER, WICKERSHAM & TAFT LLP


By: /s/ Martin L. Seidel
    Martin L. Seidel
    martin.seidel@cwt.com
    Joshua R. Weiss
    joshua.weiss.cwt.com
    Martin S. Krezalek
    martin.krezalek@cwt.com

    One World Financial Center
    New York, New York  10281
    Telephone: (212) 504-6000

    *Attorneys for Plaintiff*
    *RG Steel, LLC*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RG STEEL, LLC,

                              Plaintiff,

              -against-

SEVERSTAL US HOLDINGS, LLC and SEVERSTAL US
HOLDINGS II, LLC,

                              Defendants.

Index No.

**COMPLAINT**

Plaintiff RG Steel, LLC, ("RG Steel" or Plaintiff") by and through its undersigned counsel, for its Complaint against defendants Severstal US Holdings, LLC ("SUSH") and Severstal US Holdings II, LLC ("SUSH II", together with SUSH, "Severstal" or "Defendants"), alleges upon knowledge with respect to itself and its own acts and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

1.     In this action RG Steel seeks to recover from Severstal over $100 million in losses or damages sustained in connection with its purchase of certain steel mills from Severstal. As discussed below, Severstal's serial breaches of its contractual representations, warranties and covenants vastly inflated the purchase price paid by RG Steel for these steel mills located in Sparrows Point, Maryland, Warren, Ohio and Wheeling, West Virginia.

2.     RG Steel is contractually entitled to be fully indemnified (with interest) for these breaches, including the payment by Severstal of RG Steel's attorney fees.

3.     Severstal had acquired these steel mills in 2008 when, fueled by its ambition to become a major player in the North American steel industry, Russian steelmaker

OAO Severstal, (through its wholly owned subsidiary Severstal North America) expanded its North American presence by purchasing several steel making mills in the United States, including the Sparrows Point, Warren and Wheeling mills that were eventually sold to RG Steel. OAO Severstal is the Defendants' foreign parent.

4.       More specifically, in a year in which the steel industry was at the peak of the steel cycle, OAO Severstal purchased: (i) in March 2008, the Sparrows Point mill, which became known as Severstal Sparrows Point, LLC ("Sparrows Point"), (ii) in May 2008, the former WCI Steel Inc. in Warren, Ohio, which became known as Severstal Warren LLC ("Warren"), and (iii) in August 2008, the Wheeling-Pittsburgh Steel Corp. in Wheeling West Virginia, which became known as Severstal Wheeling Inc. ("Wheeling")

5.       However, it soon became apparent that OAO Severstal had substantially overpaid for these assets.  Grappling with low demand for steel, Severstal shut down the Wheeling and Warren mills in 2009, and Severstal shut down the Sparrows Point mill in 2010. The idling of these mills resulted in the layoffs of nearly two thousand workers.  In fact, OAO Severstal wrote off hundreds of millions of dollars claiming an impairment to the value of these mills.  For example, OAO Severstal originally purchased Warren for a total consideration of $443.1 million but took an impairment charge of $382.6 million on its 2008 books, of which $376 million was allocated to property, plant and equipment.  Similarly, while it originally paid $775 million for Wheeling, OAO Severstal then took a $621.8 million impairment loss on its 2008 books, of which $557.4 million was allocated to property, plant and equipment.  By mid-2010, after just two years of ownership, OAO Severstal was openly seeking to divest these mills for which it had substantially overpaid.

6.       Severstal and RG Steel entered into a Stock Purchase Agreement, dated March 1, 2011 (the "SPA"), pursuant to which RG Steel agreed to purchase the equity in

Warren, Wheeling and Sparrows Point.  Specifically, RG Steel purchased all of the equity of Sparrows Point, which in turn owned all of the outstanding equity of Warren and Wheeling. True and correct copies of the SPA and the relevant disclosure schedules thereto are attached as Exhibit 1.

       7.    As part of the SPA, RG Steel committed to pay $125 million in cash (adjusted up or down based upon the amount of working capital at Closing), delivered a secured $100 million note due five years after Closing, undertook to repay $317 million of third party debt and agreed to cause the acquired business to pay an additional $36 million on the first anniversary of the Closing.  The various steel mills being acquired by RG Steel also retained accounts payable, and employee related and environmental liabilities of approximately $900 million.  By any objective measure, the consideration paid by RG Steel constituted a huge discount to the price paid by OAO Severstal for the three mills less than three years before.

       8.    The failure of these three steel mills during Severstal's ownership was evident and RG Steel was aware that the purchase price to be paid by RG Steel was substantially less than previously paid by Severstal.  Nevertheless, RG Steel did not buy the steel mills relying solely upon its own diligence or on an "as is" basis, but upon the explicit terms of the SPA, including, among other things, detailed representations which were negotiated extensively by the parties and a contractual commitment to provide a good faith estimate of the amount of net working capital at closing, a particularly critical issue because of the significant liquidity necessary to operate the three steel mills.  Whether by inattention to the content of the representations and warranties, or perhaps due to Severstal's eagerness to separate itself from the three then failing steel mills, Severstal inflated the value of the steel mills and thus, as a result, the consideration to be paid by RG Steel.  Moreover, Severstal grossly underestimated liabilities to third parties owed by the mills, or simply failed to account for these known liabilities in

violation of its contractual obligation under the SPA to provide good faith estimates for purposes of calculating the cash portion of the purchase price to be paid at Closing.

9.     The representations and warranties given by Severstal to RG Steel were bargained-for terms of the stock purchase agreement, pursuant to which RG Steel acquired from Defendants the equity in the Sparrows Point, Warren and Wheeling mills.  Indeed, these representations and warranties were integral to the deal and RG Steel relied upon the existence of these representations and warranties about the three steel mills in connection with its decision to enter into the SPA and to pay the agreed-upon purchase price for the three steel mills.

10.     After the closing of the acquisition, RG Steel discovered that many of Severstal's representations and warranties were false or materially inaccurate and that it had breached various covenants in the SPA.

11.     For example, Severstal omitted numerous material contracts and significant amendments or "exhibits" to material contracts, including but not limited to the contracts and amendments discussed below, from the disclosure schedules.  Among the contracts and amendments that Severstal omitted were amendments to certain coke supply agreements which significantly raised the price that the Sparrows Point mill was obligated to pay for coke under such agreements.  Severstal had represented that RG Steel was assuming the benefits of a ten-year *fixed price* agreement that would have spared RG Steel from being subject to the market fluctuations in the price of coke – one of the two essential raw materials involved in steel making – over the life of the supply agreement.  Instead of being able to purchase coke at a discount as Severstal represented, the undisclosed amendments had the effect of raising the price of coke under the agreement by at least $80 million over the life of the supply agreements.  Severstal likewise failed to disclose that it had entered into a significant transportation contract which obligated the Warren mill to pay a deferred liability stemming from Severstal's failure to meet its

minimum volume commitments under a previous contract with the transportation provider. Furthermore, Severstal failed to disclose the existence of numerous product sales agreements which obligated the Sparrows Point mill to provide tin plate to third parties at a prices substantially below the mill's cost of production.

12.     What's more, the matters described above – the undisclosed amendments to the coke supply agreements and transportation contract – separately also constituted misrepresentations by Severstal that the steel mills had been operating in the ordinary course of their businesses consistent with prior practice and that the steel mills had not modified their payment practices with any of their material suppliers in any material respects.

13.     Similarly, Severstal made several misrepresentations regarding the ownership or adequacy of the assets needed to operate the steel mills that were being purchased by RG Steel.  Such misrepresentations included Severstal's failure to disclose that it did not own a certain pulverized coal injection ("PCI") plant, a significant asset within the Sparrows Point facility which is used to grind coal for injection into the blast furnace.  Nor did Severstal disclose that certain collateral backing a letter of credit that was required in order to maintain workers compensation insurance for the facilities was not owned by any of the mills that RG Steel was buying.  Consequently, RG Steel must put up its own collateral to secure this statutorily required letter of credit.

14.     Severstal also breached its representation that it had prepared its financial statements in accordance with generally accepted accounting principles ("GAAP") in accordance with GAAP.

15.     Lastly, Severstal breached covenants in the SPA which were integral to the determination of the "Initial Purchase Price," *i.e.,* the cash paid at closing.  In particular, the SPA provides that the Initial Purchase Price was to be determined based upon Severstal's

calculation of "Estimated Net Working Capital," as reflected in the "Estimated Closing Statement." According to the SPA, Severstal was required to prepare the Estimated Closing Statement "acting reasonably and in good faith." As RG Steel subsequently discovered, Severstal directed that the Estimated Closing Statement be prepared in a such a haphazard and unreasonable manner that Severstal overstated the amount of working capital available at closing by tens of millions of dollars.

16.     As a result of these misrepresentations and breaches of covenants, RG Steel has incurred Losses (as defined in the SPA) for which it is contractually-entitled to be compensated or indemnified by Severstal.

17.     Despite RG Steel's contractual entitlement to compensation or indemnification for such Losses, to date, Severstal has failed and refused to compensate or indemnify RG Steel. This is despite the fact that the Losses for which RG Steel seeks indemnification are well within the scope of the SPA. Indeed, the SPA expressly contemplates indemnification with respect to Losses which are the result of certain misrepresentations could be as much as $166 million.[1]

18.     In addition to the above breaches of representations and warranties, Severstal has so obstructed the agreed-upon process for a post-closing purchase price adjustment that it has thwarted the very purpose and structure of the SPA's provisions regarding the timing of the determination and payment of the final purchase price.

19.     The SPA provides for (1) a post-closing purchase price adjustment process that was to be completed within 6 months of closing, and (2) a $36 million payment in respect of

---

[1] Specifically, Section 8.02(c)(iv) provides that "An Indemnifying Party shall have no further indemnity obligations under this Article VIII once the aggregate of all Covered Losses paid by it equals $166,250,000." Section 8.02(d) clarifies that this limitation does not apply to all misrepresentations or to breaches of covenant.

the purchase price to be paid 6 months later, on the 1 year anniversary of the closing. Clearly, this would allow the parties to set off against the $36 million any amounts owed by Severstal to RG Steel as a result of the purchase adjustment. However, through various delay tactics, Severstal has so obstructed the orderly process set out in the SPA, that it has made compliance with the timetable contemplated by the SPA impossible. Because Severstal will undoubtedly owe RG Steel tens of millions of dollars upon the conclusion of the purchase price adjustment process, it would be inequitable and contrary to the intent and spirit of the SPA to require RG Steel to pay the $36 million until and unless the final purchase price adjustment is finally resolved.

20.     Accordingly, RG Steel brings this action to (1) recover in excess of $100 million in Losses it has sustained as a result of Severstal's breach of their representations, warranties and covenants in the SPA, and (2) obtain an order of the Court relieving it of any obligation to make the $36 million payment to Severstal until the conclusion of the post-closing purchase price adjustment process.

## PARTIES

21.     Plaintiff RG Steel is a Delaware limited liability company.

22.     Defendant SUSH is a Delaware limited liability company. On information and belief, it owns all of the issued and outstanding equity interests of SUSH II.

23.     Defendant SUSH II is a Delaware corporation. It is the former owner of all of the issued and outstanding equity interests of Severstal Sparrows Point.

## JURISDICTION AND VENUE

24.     Venue in this Court is proper under CPLR 501, and this court may exercise jurisdiction over the Defendants because, pursuant to Section 10.08 of the SPA, the Defendants irrevocably consented to the jurisdiction of this Court and agreed that any action

seeking to enforce any provision of, or based on any matter arising out of, or in connection with, the SPA would be brought exclusively in this Court or in the United States District Court sitting in the Borough of Manhattan.

## FACTUAL ALLEGATIONS

**A.     Defendants' Representations, Warranties and Indemnity Obligations Under The SPA**

25.     In negotiating the SPA, RG Steel bargained for and obtained multiple express representations and warranties from Severstal concerning the steel mill businesses that were being acquired by RG Steel.  In particular, the preamble to Article II provides that:

> Except as otherwise set forth in a schedule to any particular representation and warranty (collectively, the "Disclosure Schedules"), the Company and Parents represent and warrant to Purchaser that all of the statements contained in this Article II are true as of the date of this Agreement (or, if made as of a specified date, such date)"

26.     Each of the representations and warranties given by Severstal in Article II of the SPA constituted part of the basis of the bargain between RG Steel and Defendants, and RG Steel relied upon the existence of these representations and warranties in deciding to enter into the SPA and to pay the agreed-upon purchase price for the acquisition contemplated by the SPA.

27.     Section 8.02 of the SPA provides that Severstal must indemnify and hold harmless RG Steel for any breach of representation or warranty given by Severstal in Article II or failure to perform or fulfill any covenant contained in the SPA.  Specifically, Section 8.02 provides:

> Subject to the provisions of this Article VII, from and after the Closing, Parents shall, jointly and severally, indemnify Purchaser and its Affiliates, officers, directors, agents, successors and assigns (collectively, the "Purchaser Indemnitees") in respect of, and hold them harmless from and against, any and all Losses suffered, incurred or sustained by a Purchaser Indemnitee by reason of or resulting from (i) any inaccuracy or breach of a representation or

warranty of Parents and the Company contained in <u>Article II</u> of this Agreement or (ii) any nonfulfillment of or failure to perform any covenant or agreement on the part of any of the Parents or, with respect to covenants or agreements to be performed prior to the Closing, the Company, contained in this Agreement.

28.     "Loss" is defined in Article IX of the SPA as "any and all damages, Liabilities, costs and expenses (including reasonable attorneys' fees)."

29.     "Liabilities" is defined in Article IX of the SPA as "any and all costs, debts liabilities and obligations, whether accrued or fixed, absolute or contingent, known or unknown, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any contract, arrangement or undertaking."

30.     Section 8.01 of the SPA provides that, with limited exceptions not applicable to this action, "[t]he representations and warranties in th[e] [SPA] shall expire on the eighteen (18) month anniversary of the [March 31, 2011] Closing Date," <u>i.e.</u>, on September 30, 2012.   Section 8.01 of the SPA also provides that "[e]xcept as otherwise provided in this Agreement, the covenants and agreements of [Severstal] shall remain in full force and effect in accordance with their terms."

31.     By letter dated December 31, 2011, RG Steel gave notice to Severstal of the indemnity claims set forth below and demanded indemnity from Severstal in accordance with its obligations under the SPA.   By letter dated January 20, 2012, Severstal rejected RG Steel's claims and refused to indemnify RG Steel.

**B.     <u>Severstal's Breaches Of Its Express Representations And Warranties</u>**

**1.     Defendants' Omission Of Material Contracts And Amendments To Material Contracts**

32.     In violation of the SPA, Severstal misrepresented, or failed to disclose, numerous material contracts, each of which exceeded $1 million.

33.     In Section 2.16 of the SPA, Severstal represented and warranted that

Schedule 2.16:

> contains an accurate list as of the date of this Agreement of all the
> Contracts of the following types to which the Company or a
> subsidiary thereof is a party or to which any of its assets or
> properties is subject (the "Material Contracts"), which list includes
> the title of such Material Contract, the names of the parties thereto,
> the date thereof, and the same information with respect to any
> amendments thereto

See Ex. 1 at 20.

34.     Subsections (a) through (n) of Section 2.16 comprise a list of the types of

agreements which constitute Material Contracts. In particular, (e), (i) and (j) include:

> (e)     any agreement, commitment or other Contract[2] which
> involves the payment or receipt of an amount in excess of
> $1,000,000
>
> (i)     any agreement, invoice, purchase order or other
> arrangement with any supplier or for the furnishing of services
> under the terms of which the Company or any of its Subsidiaries (i)
> is likely to pay or otherwise give consideration of more than
> $1,000,000 in the aggregate during the calendar year ending
> December 31, 2011 or any calendar year thereafter or (ii) is likely
> to pay or otherwise give consideration of more than $5,000,000 in
> the aggregate over the remaining term of such agreement, in each
> case, that is not otherwise included under Section 2.16(d)
>
> (j)     any agreement, invoice, sales order or other arrangement
> for the sale of Inventory or for the furnishing of services by the
> Business that (i) is likely to involve consideration of more than
> $1,000,000 in the aggregate during the calendar year ending
> December 31, 2011 or any calendar year thereafter or (ii) is likely
> to involve consideration of more than $5,000,000 in the aggregate
> over the remaining term of such agreement, in each case, that is not
> otherwise included under Section 2.16(d)

---

[2] "Contract" is defined in Section 9.01 of the SPA as "any loan or credit agreement, bond, debenture,
note, mortgage, indenture, lease, supply agreement, license agreement, development agreement or other
contract, agreement, obligation, commitment or instrument that is legally binding, including all
amendments thereto."  Ex. 1 at 51.

See Ex. 1 at 20.

35.     Under Section 2.16, Severstal also represented that it "made available to Purchaser a true and complete copy of each Material Contract."  See Ex. 1 at 20.

36.     As set forth below, these representations were false and/or materially inaccurate because (i) Severstal omitted certain Material Contracts and amendments or purported "exhibits" to Material Contracts from Schedule 2.16, and (ii) did not make true and correct copies of such omitted Material Contracts and amendments or purported "exhibits" available to RG Steel.  The omitted Material Contracts and amendments or "exhibits" to material contracts, include, but are not limited to, the contracts and amendments discussed below:

**a.   The January 31 Letter Notifying Severstal re: the Amendment of the Terms Of The Haverhill and Jewell Coke Contracts**

37.     Severstal falsely represented that RG Steel was assuming the benefits of a ten-year fixed price agreement that would have allowed RG Steel to purchase coke at relatively fixed conversion prices for the life of the agreement and thereby significantly eliminate market risk.

38.     Schedule 2.16 included the following two agreements:

Coke Purchase Agreement, dated October 28, 2003, by and between Haverhill North Coke Company and ISG Cleveland Inc., ISG Indiana Harbor Inc., and ISG Sparrows Point Inc., as amended on December 5, 2003 (the "Haverhill Agreement")

-and-

Amended and Restated Coke Supply Agreement, dated October 28, 2003, by and between ISG Cleveland Inc., ISG Indiana Harbor Inc., and ISG Sparrows Point Inc., as amended by Amendment No. 1, dated December 5, 2003 (the "Jewell Agreement")

See Ex. 1; Disclosure Schedules at 90.

39.     Schedule 2.16 also includes the following related agreement:

Service Provision Agreement, dated May 7, 2008, by and between ISG Sparrows Point Inc. and ArcelorMittal Cleveland Inc. ("ArcelorMittal") (the "Service Provision Agreement")

See Ex. 1; Disclosure Schedules at 97.

40.     ISG Sparrows Point Inc. ("ISG Sparrows") is a predecessor in interest to Severstal Sparrows Point LLC.  By including the Haverhill Agreement, the Jewell Agreement and the Service Provision Agreement in Schedule 2.16, Severstal represented that Severstal Sparrows Point LLC had rights and obligations under the Haverhill Agreement and the Jewell Agreement, including the benefit of a favorable ten year pricing provision.

41.     The Service Provision Agreement was entered into at the time when Severstal acquired ISG Sparrows from ArcelorMittal.  Under the Service Provision Agreement, ArcelorMittal was to act as an intermediary that would buy coke from the seller under the Haverhill Agreement and the Jewel Agreement, and in turn, re-sell the coke onto Severstal Sparrows Point LLC.

42.     In particular, the Service Provision Agreement provides that

Upon delivery of the Sparrows Point Coke to the Delivery Point (as defined in the Coke Supply Agreements) relating to the Sparrows Point facility, (i) Recipient [Severstal Sparrows Point LLC] shall notify Provider [ArcelorMittal] in writing of the occurrence of such delivery, (ii) Recipient shall pay Provider in cash all amounts owed by Provider for the Sparrows Point Coke *pursuant to the applicable Coke Supply Agreement* and (iii) Recipient shall take title to the Sparrows Point Coke."[3]

43.     Although Defendants disclosed the existence of (and provided copies of) the Haverhill Agreement, the Jewell Agreement and the Service Provision Agreement, Severstal failed to disclose that, pursuant to the terms of a letter agreement entered into by ISG Sparrows, ISG Sparrows (and therefore Severstal Sparrows LLC) withdrew as a party to the Haverhill

---

[3] The "applicable Coke Supply Agreement" as it pertains to this claim is the Haverhill Agreement.

Agreement and the Jewell Agreement and, accordingly, was no longer entitled to the benefit of the favorable ten year pricing provision contained therein.  Defendants also failed to disclose (i) Amendment No. 4 to the Haverhill Agreement, (ii) Amendment No. 3 to the Jewell Agreement, and (iii) the existence of a letter, dated January 31, 2011, from ArcelorMittal to Severstal N.A. ("the January 31 Letter"), in which ArcelorMittal stated that, pursuant to Amendment No. 4 of the Haverhill Agreement and Amendment No. 3 to the Jewell Agreement, the favorable pricing provision had been removed and that the price to be paid by Severstal Sparrows Point LLC, pursuant to its obligations under the Service Provision Agreement, had been substantially increased for coke purchased for Severstal Sparrows Point LLC by ArcelorMittal under the Haverhill Agreement and the Jewell Agreement.

44.     The January 31 Letter informed Severstal N.A. that ArcelorMittal had amended the Haverhill and Jewell Agreements to raise the price from $22.00 *fixed*/$20.90 *variable* and $10.10 *fixed*/$22.00 *variable* under the Haverhill and Jewell Agreements, respectively, to $37.50 *fixed*/$37.50 *variable*, under both agreements, resulting in a net increase of approximately $32.00 per ton under the Haverhill Agreement and approximately $43.00 per ton under the Jewell Agreement.  This equates to an aggregate price increase of $80.7 million over the term of the contracts.[4]

45.     Severstal N.A. did not object to the price increase called for in the January 31, Letter and, upon information and belief, subsequent to January 31, 2011, began to pay the increased price set forth in the January 31 Letter.

---

[4] The Services Provision Agreement obligated ArcelorMittal to sell and RG Steel Sparrows Point, LLC to purchase approximately 20,000 tons per month, for 120 months, according to terms of the Haverhill Agreement and the Jewell Agreement.

46.     By not disclosing the existence of the January 31 Letter and Amendments Nos 3 & 4, Defendants failed to disclose amendments to a Material Contract.  As a result, Severstal's Section 2.16 representations, as they pertain to the Haverill and Jewell Agreements and the Service Provision Agreement, are false or materially inaccurate.

**b. Pellet Sale And Purchase Agreement**

47.     Schedule 2.16 identifies the a Pellet Sale and Purchase Agreement dated December 1, 2009 with Cliffs Sales Company, as amended effective December 1, 2009, June 1, 2010, July 1, 2010 and February 25, 2011 (and as supplemented by the related letter agreement dated February 25, 2011 (collectively, the "Pellet Agreement").

48.     In general, the Pellet Agreement provides that Cliffs Sales Company ("Cliffs") will sell and Severstal Sparrows Point LLC will purchase pellets during the contract period.

49.     In or about July 2011 a dispute arose between RG Steel and Cliffs over the pricing formula set forth in the February 25, 2011 Amendment, which amendment was executed by Severstal.  Cliffs contends that Severstal agreed to the pricing on which its claim is based.  No such agreement was disclosed to RG Steel by Severstal or listed on Schedule 2.16.  The parties were unable to resolve the dispute and Cliffs demanded arbitration.

50.     While RG Steel disputes liability in the underlying arbitration, it has incurred substantial attorneys' fees and other costs defending the claims brought by Cliffs.[5]

51.     By letter dated August 2, 2011 (and a follow-up letter dated September 9, 2011), RG Steel delivered to Severstal a Claim Notice, as defined in Section 8.03 of the SPA

---

[5] In the event that, during the pendency of this action, the arbitration panel rules in favor of Cliffs and issues an award against RG Steel, RG Steel will amend the Complaint to seek damages in the amount of such award plus its attorneys' fees and costs.

apprising Severstal of its discussions with Cliffs on the matter.  In the September 9, 2011 letter

RG Steel advised Severstal that Cliffs had commenced an arbitration proceeding with respect to

such matter.  By letter dated September 27, 2011, Defendants refused to indemnify RG Steel in

respect of this claim and refused to assume the defense of such claim.

> **c.  December 2010 Transportation Contract With Norfolk
> Southern**

52.     Schedule 2.16 includes a contract, dated February 9, 2007, by and between

WCI Steel, Inc. (the predecessor-in-interest to Severstal Warren, LLC, which is the predecessor-

in-interest to RG Steel Warren, LLC) and Norfolk Southern Railway Company and its subsidiary

railroads (the "Feb. 9, 2007 Transportation Contract").  See Ex. 1; Disclosure Schedules at 95.

53.     The Feb. 9, 2007 Transportation Contract had a fifteen year term, and

required WCI Steel, Inc. to transport with Norfolk Southern no less than 215,000 tons of coke

per year from the Haverhill, Ohio coke plant.

54.     Severstal Warren LLC did not meet its obligations under the February 9,

2007 Transportation Contract, which resulted in an obligation on its part to pay to Norfolk

Southern the sum of approximately $1,425,450.00 (the "Accrued Liability").

55.     On or around December 1, 2010, Severstal Warren, LLC, terminated the

Feb. 9, 2007 Transportation Contract and entered into a new transportation contract with Norfolk

Southern (the "2010 Transportation Agreement").

56.     Pursuant to Section 14(c) of the 2010 Transportation Agreement, Norfolk

Southern agreed to defer collection of the Accrued Liability and to add it as an additional

commitment under the 2010 Transportation Agreement.  Norfolk Southern also agreed to count

the quantities required to be transported under the 2010 Transportation Agreement against the

minimum quantities required under the terms of the Feb. 9, 2007 Transportation Contract.
Specifically, the relevant portion of Section 14(c) provided:

> The parties acknowledge that [Severstal Warren] has a minimum volume commitment under a separate Transportation Contract between the parties identified as [Feb. 9, 2007 Transportation Contract] equal to 215,000 tons per year for each year from 2009 through 2024 (the "Prior Minimum Volume"). The parties further acknowledge that no tonnage was shipped under [Feb. 9, 2007 Transportation Contract] in 2009, resulting in a 215,000 ton deficit and an obligation on [Severstal Warren] to pay [Norfolk Southern] $1,425,450 (the "Accrued Liability"). [Norfolk Southern] shall forgo collection of the Accrued Liability and 215,000 tons is hereby added to the Prior Minimum Volume for 2024 . . .

57.     Severstal failed to disclose the existence of the 2010 Transportation Agreement which obligated Severstal Warren, LLC to pay the Accrued Liability.  As a result of Severstal's failure to disclose this Material Contract, RG Steel has suffered a loss of $1,425,450.00.

**d.  Product Sales Agreements To Sell Tin Plate**

58.     Defendants entered into a series of product sales agreements, each of which exceeded $1 million, which obligated Severstal Sparrows Point LLC to provide tin plate to third parties.

59.     In particular, Defendants failed to disclose the existence of the agreements to sell tin to the following entities:

(a)     BWAY Corporation

(b)     Can Corp of America, Inc.

(c)     J.L. Clark, Inc.

(d)     Coilplus North Carolina, Inc.

(e)     Independent Can Co.

-16-

(f)     ITW Sexton

(g)     New Can Co., Inc.

(h)     Silgan Can Co.

(i)     Silgan Containers Corp.

(j)     Steel Technologies, Inc.

60.     These agreements are Material Contracts which Severstal was required to disclose on Schedule 2.16.

61.     These agreements obligated Severstal Sparrows Point LLC to sell tin plate at a price below its cost of production.  Thus, as a result of Severstal's failure to disclose these agreements, RG Steel has suffered a loss of at least $38 million.

**C.     Misrepresentation Regarding The Ownership and Adequacy Of The Assets Needed To Operate The Companies Being Purchased By RG Steel**

62.     Additionally, in violation of the SPA, Severstal failed to disclose that it did not own certain significant assets which are necessary for the conduct of the business acquired by RG Steel.

63.     In Section 2.21 of the SPA, Severstal represented and warranted that:

Except for the assets and services to be provided under the Transition Services Agreement, the Supply agreement and the agreements to be assumed by [RG Steel] pursuant to Section 4.14(c) hereof, and except as set forth on Schedule 2.21, *[Severstal] and its Subsidiaries own, lease or have the legal right to use all of the properties and assets necessary for the conduct of the Business in all material respects* as (i) had been conducted immediately prior to the idling of Severstal Wheeling, Inc.'s facilities that occurred in August 2008 and (ii) is currently being conducted.

See Ex. 1 at 22 (emphasis added).

64.     As set forth below, this representation was false and/or materially inaccurate and, as a result, RG Steel has suffered Losses.

**1.      PCI Facility at Sparrows Point**

65.     Severstal failed to disclose that Sparrows Point did not own the PCI plant, a significant part of the Sparrows Point facility which is necessary for the conduct of the business of Sparrows Point, and that RG Steel would have to pay a lease fee to use PCI plant.

66.     Severstal disclosed the existence of a Pulverized Coal Supply Agreement, dated November 30, 1998, by and between Bethlehem Steel Corporation, and DTE Sparrows Point LLC ("DTE") (the "DTE Supply Agreement").  Under the DTE Supply Agreement, DTE operates the PCI plant at Sparrows Point.

67.     Contrary to the representation and warranty in Section 2.21 of the SPA, the DTE Supply Agreement is more than an ordinary "supply" agreement.  Under the DTE Supply Agreement, DTE (not Sparrows Point LLC) owned the facility.  Consequently, built into the monthly processing fee that RG Steel already must pay to grind coal, is an additional *lease fee* for the PCI facility.

68.     Severstal failed to disclose this lease fee and the fact that the PCI facility is not owned by Sparrows Point LLC.  As a result, RG Steel has suffered a Loss equal to the fair market value of the facility, an amount estimated to be in excess of $30 million.

**2.      WesBanco Letter of Credit Collateral**

69.     WesBanco, on behalf of Severstal, issued a $6 million dollar Letter of Credit ("LC") in favor of the Ohio Bureau of Workers' Compensation.  The LC was and is required in order to maintain workers compensation insurance for the Wheeling facilities.

70.     Contrary to the representation and warranty in Section 2.21, the collateral backing the LC in favor of the Ohio Bureau of Workers' Compensation is owned by an affiliate of the Severstal that was not acquired by RG Steel pursuant to the SPA.

71.     Pursuant to a letter, dated July 1, 2011, from Severstal N.A. to RG Steel, LLC (the "July 1, Settlement Letter"), RG Steel agreed to release the LC in favor of the Ohio Bureau of Workers' Compensation.

72.     Specifically, the July 1, Settlement Letter provides that:

> On or prior to the date on which payment is made by RG or Severstal pursuant to Section 1.04(b)(iv) of the SPA, RG shall cause the Ohio Bureau of Workers' Compensation to release the letter of credit referenced in item 7 of Schedule 4.10 of the SPA[6]

73.     Following the release in the July 1, Settlement Letter, RG Steel will have to post $6 million in collateral to secure a new letter of credit in favor of the Ohio Bureau of Workers' Compensation.  Accordingly, RG Steel has suffered a loss of $6 million.

**D.     Misrepresentations Regarding The Absence of Certain Changes**

74.     Additionally, in violation of the SPA, Severstal failed to disclose the existence of certain changes to its payment practices with respect to certain agreements.

75.     In Section 2.15 of the SPA, Severstal represented and warranted that:

(a)     Except as set forth in Schedule 2.15, since September 30, 2010 to the date of this Agreement:

(i) the Business has been conducted in the ordinary course consistent with prior practice;

(x) neither the Company nor any of its Subsidiaries has amended, terminated, cancelled or compromised any material claims or waived any other rights of substantial value;

---

[6] Item 7 of Schedule 4.10 of the SPA provides: "Severstal US Holdings II, Inc. (on behalf of Severstal Wheeling, Inc.) letter of credit in favor of the Ohio Bureau of Workers' Compensation for $6,000,000.00" See Ex. 1; Disclosure Schedules at 122.

(xvi) neither the Company on [sic] any of its Subsidiaries has modified in any material respects its payment practices with any of its material suppliers.

76.     This representation was false and/or materially inaccurate and, as a result, RG Steel has suffered Losses.  In particular, as set forth in paragraphs 43 to 52, and 58 to 63 above, Severstal failed to disclose that:

(a)     Pursuant to the amendments to the Haverhill Agreement and the Jewell Agreement, it materially modified its payment practices with respect to the purchase of coke under the Haverhill Agreement, Jewell Agreement and Services Provision Agreement (*see supra* at ¶¶ 43 to 52);

(b)     Pursuant to the 2010 Transportation Agreement, it materially modified its payment practices under the February 2007 Transportation Agreement (*see supra* at ¶¶ 58 to 63).

**E.     The Final Purchase Price**

77.     The final purchase price paid by RG Steel had multiple components and was to be determined by an express process set forth in the SPA: (1) a cash payment at closing of $125 million, subject to a pre-closing adjustment, (2) a secured note in the amount of $100 million, (3) a post-closing purchase price adjustment, and (4) a payment of $36 million at the one year anniversary of the closing.

78.     The SPA provides that, at closing, RG Steel would pay $125 million in cash, adjusted by the amount by which Estimated Net Working Capital, differed from a target amount of $450 million.  Thus, for example, if Estimated Net Working Capital was only $400 million, RG Steel's cash payment would be $75 million, *i.e.,* $125 million – ($450 million – $400 million).

79.     Section 1.04(b) expressly obligated Defendants to calculate Estimated Net Working Capital "acting reasonably and in good faith."  However, Defendants did not do so.

80.     For example, the Estimated Closing Statement included an Estimated Net Working Capital amount of $398,602,000.  However, this amount was dramatically overstated for various reasons including that, as Defendants knew or should have known, it did not include tens of millions of dollars in accounts payable and grossly overstated the value of certain steel inventory.

81.     Specifically, although in the nine months preceding the preparation of Estimated Net Working Capital, Warren had an average of $74,451,000 in accounts payable, Defendants only included $52,581,000 for Warren accounts payable in their calculation of Estimated Net Working Capital.  Moreover, although over the same period Warren had an average of $32,623,000 in unaudited accounts payable (a component of overall accounts payable), the estimate of Warren's total accounts payable that was included in Estimated Net Working Capital only included $5,110,000 in unaudited accounts payable.

82.     The structure of the SPA contemplates that the post-closing purchase price adjustment referenced in paragraph 83(3) above was to be resolved, and a final purchase price determined, prior to the one year anniversary of the closing and, therefore, prior to the payment of the $36 million.  Specifically, the timeline set out in section 1.04(b) of the SPA provides that the post-closing adjustment process, including arbitration, if necessary, was to be completed in less than six months after closing.  To the extent that the result of the post-closing purchase price adjustment required Severstal to pay RG Steel, that would reduce or eliminate the obligation of RG Steel to make the $36 million payment on the one year anniversary of the closing.  Indeed, had the post-closing purchase price adjustment process been completed, as contemplated by the SPA, Severstal would owe RG Steel substantially more than $36 million.

83.     However, Severstal engaged in various delay tactics which resulted in the fact that to date, the purchase price adjustment process has not been resolved, and likely will not be resolved for many months.  For example, Severstal strung-out the pre-arbitration negotiations over various Contested Adjustments by repeatedly demanding more information and repeatedly claiming that it had insufficient information to address RG Steel's claims.  However, after RG Steel made its initial submission in the arbitration, Severstal conceded various Contested Adjustments with respect to which it had previously demanded more information, notwithstanding that RG Steel's submission did not provide any additional information.  Then, Severstal instituted a lawsuit seeking a declaratory judgment that it was not obligated to arbitrate the parties' post-closing adjustment disputes.  Based on that lawsuit, Severstal refused to proceed with arbitration on even those disputes with respect to which it did not contest arbitrability.  In response, RG Steel filed a motion to compel arbitration.

84.     Although Severstal eventually consented to arbitrate a subset of the parties disputes, it so obstructed the process that it took the parties three months to even negotiate and enter into an engagement letter with an arbitrator.   Indeed, Severstal repeatedly made unreasonable demands that it knew would delay the parties entry into an engagement letter.  For example, Severstal demanded that the engagement letter include language providing that (1) in the event that a court granted RG Steel's pending motion to compel arbitration of all of the disputes, no arbitration would commence on the disputes subject to that motion until Severstal exhausted its appellate rights against the order granting the motion to compel, and (2) no award in respect of the disputes with respect to which it did not contest arbitrability would be final or enforceable until the disputes with respect to which it did contest arbitrability were finally resolved.

85.     Accordingly, Defendants, as a result of their improper delay tactics, have created a circumstance where the anniversary of the closing will have arrived before the final purchase prices is determined by the post-closing purchase price adjustment process.  In so doing, Defendants have thwarted and violated the structure and intent of the SPA's provisions regarding the determination and payment of the final purchase price.

### 1.     The Purchase Price Adjustment Dispute

86.     The claims set forth in paragraphs 94 to 123 below are the subject of a pending case in the United States District Court for the Southern District of New York, captioned *Severstal US Holdings et. al. v. RG Steel, LLC*, No. 11-cv-6922 (RWS) (the "Purchase Price Adjustment Litigation").  The central question being addressed in that action is whether certain claims made by RG Steel against Severstal under the SPA are claims for indemnity and, thus, properly part of this complaint or are claims for a purchase price adjustment and, thus, are within the scope of the SPA's arbitration provision.

87.     Thus, although RG Steel maintains that the claims being addressed in the Purchase Price Adjustment Dispute are within the scope of the SPA's arbitration clause, in order to preserve its rights to bring these claims should the court presiding over the Purchase Price Adjustment Litigation find otherwise, it has asserted the claims in this complaint.[7]

### 2.     Background Of The Purchase Price Adjustment Dispute

88.     The SPA established a framework to adjust the purchase price paid by RG Steel, post-closing.   According to that framework, within 60 days of the closing of the transaction, Severstal was required to deliver to RG Steel a "Closing Statement," which included

---

[7] In the event that the court presiding over the Purchase Price Adjustment Litigation grants RG Steel's motion to compel arbitration, RG Steel will dismiss the claims in this Complaint that will be subject to the arbitration proceedings.

Severstal's calculations of "Net Working Capital," and "Net Citicorp Indebtedness," as of the closing date. Thereafter, RG Steel had 30 days to deliver to Severstal a "Protest Notice," to the extent that RG Steel contested the calculation of any items on the Closing Statement. Severstal then had 30 days to identify any "Contested Adjustments" and deliver to RG Steel and "Objection Notice," to the extent that Severstal objected to the Protest Notice.

89.     Section 1.04(b)(ii) defines "Net Working Capital" as: "the difference between the Company's and the Subsidiaries' consolidated (A) accounts receivable . . . and inventories and (B) accounts payable, *determined in accordance with GAAP* consistently applied and following the policies procedures, principles and methods employed in preparing the Company's balance sheet as of December 31, 2010 included in the Financial Statements, and shall be calculated in the manner set forth on Schedule 1.04(b)(ii)" Exhibit 1 at 3 (emphasis added).

90.     The SPA further provides that any unresolved disputes over the Closing Statement, *i.e.,* the "Contested Adjustments," would be submitted for final resolution to arbitration before an independent accounting firm.

91.     On or about September 13, 2011, RG Steel demanded arbitration over various Contested Adjustments. However, on October 3, 2011, Severstal filed a complaint seeking a declaratory judgment that various of the Contested Adjustments RG Steel sought to arbitrate (the "Disputed CAs"), were not arbitrable. According to Severstal, the Disputed CAs were either (a) claims for breach of Severstal's representation and warranty in Section 2.06 that its financial statements were prepared in accordance with GAAP, or (b) claims for breach of the requirement in Section 1.04(b)(ii) that the Closing Statement be prepared in accordance with GAAP. On November 7, 2011, RG Steel filed a motion to compel arbitration of the Disputed

CAs.  A hearing on the matter was held December 9, 2011.  The court has not ruled on such motion.

92.     In the event that the court presiding over the Purchase Price Adjustment Litigation agrees with Severstal's characterization of the Disputed CAs and finds them to be outside the scope of the arbitration clause, RG Steel asserts the following:

**3.      Breach of Representations Regarding The Preparation Of Financial Statements in Accordance with GAAP Or Breach Of The Obligation To Prepare The Closing Statement In Accordance With GAAP**

93.     In Section 2.06(a), Defendants represented that:

> The Financial Statements have been *prepared in accordance with GAAP*, consistently applied throughout the periods indicated (except as set forth in the notes attached thereto) and *present fairly, in all material respects, the consolidated financial position of the Company and its Subsidiaries* as of the dates thereof and the results of operations and cash flows of the Company and its Subsidiaries for the periods covered thereby, except that the unaudited financial statements contained in the Financial Statements omit footnotes and are subject to normal, recurring year-end adjustments and accruals.

See Ex. 1 at pg. 8. (emphasis added).

94.     Further, as articulated above, Section 1.04(b)(ii) of the SPA requires that Severstal calculate Net Working Capital on the Closing Statement in accordance with GAAP.

95.     As set forth below, Severstal's representation in Section 2.06 was false and/or it breached Section 1.04(b)(ii) because, in various respects, (a) Defendants' December 31, 2010 financial statements were not prepared in accordance with GAAP, and (b) the calculation of Net Working Capital on the Closing Statement was not prepared in accordance with GAAP.

**a.      Sparrows Point Inventory**

96.     On the Closing Statement, Severstal calculated the value of certain steel inventory at the Sparrows Point facility, as of March 30, 2011, as $75,323,000.

97.     According to Severstal, this amount represented the cost of such steel and was the appropriate measure for valuing such inventory.

98.     However, GAAP required that such inventory be valued at the lower of cost or market.

99.     As of March 30, 2011, the market value of the steel inventory was less than its cost by $10,162,000.

100.    Thus, GAAP required that the market value, which was $10,162,000 lower than the calculation provided by Defendants, be used to value this inventory.[8]

101.    To the extent that Severstal recorded the value of the same steel inventory at its cost on Severstal's December 31, 2010 financial statements, those financial statements were not prepared in accordance with GAAP.

### b.     Warren Inventory

102.    On the Closing Statement, Severstal calculated the value of certain inventory of steel slabs and coils at the Warren facility, as of March 30, 2011, as $538,000.

103.    However, due to the special nature of the materials, as of March 30, 2011, this inventory had no value and could not be sold in the scrap market.

104.    Accordingly, GAAP required that the value of this inventory be written down to zero.

105.    Severstal failed to write down the value of the Warren inventory to zero as required by GAAP.

---

[8] Severstal does not dispute that $3,299,000 of the total $10,162,000 adjustment sought by RG Steel is arbitrable.  Thus, only $6,863,000 is at issue here.

106.   To the extent that Severstal failed to write down the value of the same steel slabs and coils on its December 31, 2010 financial statements, those financial statements were not prepared in accordance with GAAP.

c.     **Sparrows Point Accounts Payable**

107.   In calculating the Sparrows Point accounts payable balance as of March 30, 2011 on the Closing Statement, Severstal failed to include $26,698,000 in payables that, according to GAAP, should have been included.  These payables consisted of the following:

(a)     $21,714,000 owed to a vendor under a take-or-pay contract;

(b)     $1,245,000 owed to a carrier under a contract to transport pellets;

(c)     $1,181,000 for employee health benefits and taxes, accrued prior to March 30, 2011;

(d)     $2,558,000 owed to a vendor for services rendered;

108.   GAAP required that these $26,698,000 in payables be included as accounts payable on Sparrows Point's balance sheet, as of December 31, 2010.

109.   Severstal failed to include this $26,698,000 in payables in Sparrows Point's accounts payable.

110.   To the extent that these payables were outstanding as of December 31, 2010 and were not included in Severstal's December 31, 2010 financial statements, those financial statements were not prepared in accordance with GAAP.

d.     **Warren Accounts Payable**

111.   In calculating Warren's accounts payable balance as of March 30, 2011, Severstal failed to include $1,425,450 in payables that were owed by Warren pursuant to the December 2010 Transportation Contract with Norfolk Southern (discussed in Section B(1)(c) *supra*).

-27-

112.    According to GAAP, this $1,425,450 should have been included as an account payable.

113.    Severstal failed to include the $1,425,450 payable under the December 2010 Transportation Contract with Norfolk Southern as an account payable for Warren.

114.    To the extent that these payables were outstanding as of December 31, 2010 and were not included in Severstal's December 31, 2010 financial statements, those financial statements were not prepared in accordance with GAAP.

e.    **Wheeling Accounts Payable**

115.    In calculating Wheeling's accounts payable balance as of March 30, 2011 on the Closing Statement, Severstal failed to include $8,915,000 in payables that, according to GAAP, should have been included.  These consisted of the following:

(a)    $2,320,000 owed to Wheeling-Nishin, Inc. under a settlement agreement and mutual release dated July 8, 2010;

(b)    $770,000 in legal bills owed to various law firms relating to services provided to Wheeling for the periods ending on or before March 30, 2011;

(c)    $959,000 owed to the Steelworkers Pension Trust;

(d)    $2,023,000 owed to healthcare providers;

(e)    $200,000 owed to pension plans;

(f)    $2,370,000 owed to suppliers of rolls, cylinders and bearings;

(g)    $273,000 owed to various governmental agencies for sales, use and other taxes;

116.    GAAP required that Severstal include these $8,915,000 in payables as accounts payable of Wheeling.  Defendants failed to record this amount in Wheeling's accounts payable.

117.    To the extent that these payables were outstanding as of December 31, 2010 and were not included in Severstal's December 31, 2010 financial statements, those financial statements were not prepared in accordance with GAAP.

**FIRST CAUSE OF ACTION**
**(Breaches Of Representation And Warranty § 2.16: Failure To Disclose Material Contracts)**

118.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 123 of this Complaint as if fully set forth herein.

119.    The SPA is a valid and binding contract.

120.    As set forth above, Severstal expressly represented and warranted that Schedule 2.16 contained an accurate list of all the Material Contracts to which Severstal Sparrows Point LLC or its subsidiaries were parties, including any amendments thereto.

121.    These representations and warranties were part of the basis of the bargain which RG Steel entered into with Defendants, as reflected in the SPA.

122.    The items discussed in paragraphs 38 through 67, above, constitute Material Agreements under the terms of the SPA.

123.    Defendants' Section 2.16 representations and warranties were false and/or materially inaccurate because Defendants failed to disclose Material Contracts.

124.    As a result of Defendants' failure to disclose Material Contracts, RG Steel has suffered Losses.

125.    As a result of Severstal's failure to disclose Material Contracts, RG Steel has suffered Losses in an amount to be determined at trial, but in any event no less than $100 million.

**SECOND CAUSE OF ACTION**
**(Breaches Of Representation And Warranty § 2.15:  Failure To Disclose Changes To Payment Practices)**

126.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 131 of this Complaint as if fully set forth herein.

127.    The SPA is a valid and binding contract.

128.    As set forth above, in Section 2.15(i) and (xvi) Severstal expressly represented and warranted that the Business has been conducted in the ordinary course consistent with prior practice, and that neither the Company or any of its subsidiaries modified in any material respects their payment practices with any of its material suppliers.

129.    This representation and warranty was part of the basis of the bargain which RG Steel entered into with Defendants, as reflected in the SPA.

130.    The items discussed in paragraphs 80 through 82, above, constitute changes to payment practices as contemplated by the SPA.

131.    Defendants' Section 2.15 representations and warranties were false and/or materially inaccurate because Defendants failed to disclose changes to payment practices.

132.    As a result of Severstal's failure to disclose changes to payment practices, RG Steel has suffered Losses in an amount to be determined at trial, but in any event no less than $80 million.

**THIRD CAUSE OF ACTION**
**(Breach of Representation And Warranty § 2.21: Failure To Disclose Non-Ownership of**
**Properties and Assets Necessary For The Conduct Of The Business)**

133.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 138 of this Complaint as if fully set forth herein.

134.    The SPA is a valid and binding contract.

135.    As set forth above, in Section 2.21 of the SPA, Defendants expressly represented and warranted that Severstal Sparrows Point, LLC and its Subsidiaries owned, leased or had the legal right to use all of the properties and assets necessary for the conduct of the business in all material respects.

136.    These representations and warranties were part of the basis of the bargain which RG Steel entered into with Severstal, as reflected in the SPA.

137.    The items discussed in paragraphs 68 through 79 above are assets necessary for the conduct of the businesses acquired by RG Steel.

138.    Severstal's Section 2.21 representations and warranties were false because Severstal did not disclose that the businesses did not own certain critical assets.

139.    As a result of Severstal's failure to disclose that the steel mills did not own certain assets, RG Steel has suffered a Losses in amount to be determined at trial, but in any event no less than $35 million.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract: Failure To Prepare The Closing Statement**
**In Accordance With GAAP)**

140.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 145 of this Complaint as if fully set forth herein.

141.    The SPA is a valid and binding contract.

142. As set forth above, pursuant to Section 1.04(b)(ii) of the SPA, Severstal agreed that it would calculate Net Working Capital on the Closing Statement in accordance with GAAP.

143. Severstal did not calculate Net Working Capital on the Closing Statement in accordance with GAAP. Had Severstal calculated Net Working Capital on the Closing Statement in accordance with GAAP, the Closing Statement would have properly reflected that Severstal owes RG Steel a substantial amount of money as a result of the purchase price adjustment process.

144. Accordingly, if the court presiding over the Purchase Price Adjustment Dispute determines that the claims detailed in sections 94 through 123 above constitute claims for breach of contract, RG Steel has been damaged by Severstal's failure to calculate Net Working Capital on the Closing Statement in accordance with GAAP.

**FIFTH CAUSE OF ACTION**
**(In The Alternative: Breach of §2.06(a): Representations Regarding The Preparation Of Financial Statements in Accordance with GAAP)**

145. RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 150 of this Complaint as if fully set forth herein.

146. The SPA is a valid and binding contract.

147. As set forth above, in Section 2.06(a) Defendants expressly represented that their Financial Statements were prepared in accordance with GAAP, consistently applied throughout the periods indicated and presented fairly, in all material respects, the consolidated financial position of Severstal Sparrows Point and its Subsidiaries.

148. This representation and warranty was part of the basis of the bargain which RG Steel entered into with Severstal, as reflected in the SPA.

149.     Severstal's Section 2.06(a) representations and warranties were false and/or materially inaccurate to the extent that Severstal used the same non-GAAP accounting methods to prepare the December 31, 2010 financial statements that they used to prepare the Closing Statement.

150.     Accordingly, if the court presiding over the Purchase Price Adjustment Dispute determines that the claims detailed in sections 94 through 123 above constitute indemnity claims for breach of the representation and warranty in Section 2.06(a), RG Steel has suffered Losses to the extent described in paragraphs 94 through 123 above.

## SIXTH CAUSE OF ACTION
### (Declaratory Judgment)

151.     RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 156 of this Complaint as if fully set forth herein.

152.     By reason of the foregoing an actual and justiciable controversy exists.

153.     Pursuant to Sections 1.04(b) and 8.03 of the SPA, Defendants owe RG Steel substantially in excess of $36 million.

154.     Pursuant to Section 4.14(d), the SPA provides for a payment from RG Steel of $36 million on or prior to the first anniversary of the Closing Date.

155.     However, the structure and intent of the SPA contemplated that the final purchase price would be determined prior to the first anniversary of the Closing Date.

156.     Through various delaying tactics, Defendants have thwarted the intended timing and structure of the payment provisions under the SPA and, as a result, RG Steel contends that the SPA does not obligate it to pay the $36 million until and unless the post-closing purchase price adjustment process is finally resolved.

157.     Accordingly, RG Steel is entitled to a declaratory judgment declaring that it has no obligation to pay $36 million pursuant to section 4.14(d) of the SPA until the post-closing purchase price adjustment process is finally resolved and all amounts owing as a result thereof are paid and settled in full.

### SEVENTH CAUSE OF ACTION
### (Set-Off or Recoupment)

158.     RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 163 of this Complaint as if fully set forth herein.

159.     The parties obligations under the SPA arise out of a single, integrated transaction.

160.     According to the terms of the SPA, Severstal owes RG Steel tens of millions of dollars pursuant to the post-closing purchase price adjustment process, and, as evidenced by this Complaint, substantially more as a result of the various breaches of express representations, warranties and covenants.

161.     According to the SPA, a component of the purchase price is a $36 million payment from RG Steel on the anniversary of the closing.

162.     In light of the fact that Severstal owes RG Steel substantially more than $36 million and the fact that Severstal has purposefully and in bad faith delayed resolution of the post-closing purchase price adjustment process, it would be inequitable to allow Defendants to collect $36 million from RG Steel until and unless Defendants meet their payment obligations under the SPA to RG Steel.

163.     Thus, to the extent that Severstal demands payment of the $36 million, RG Steel is entitled to a recoupment or setoff against that amount for the amounts owed to it by Severstal in connection with the post-closing purchase price adjustment and indemnity claims.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract: Failure To Calculate Estimated Net Working Capital Reasonably And In Good Faith)

164.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 169 of this Complaint as if fully set forth herein.

165.    The SPA is a valid and binding contract.

166.    Section 1.04(a) obligated Severstal to calculate Estimated Net Working Capital "acting reasonably and in good faith."

167.    As described above, Severstal violated this obligation by calculating Estimated Net Working Capital in a manner and amount which it knew or should have known was dramatically overstated.

168.    RG Steel has been damaged by Severstal's failure to prepare the Estimated Closing Statement "acting reasonably and in good faith."

## NINTH CAUSE OF ACTION
### (Indemnification for RG Steel's Legal Fees and Other Expenses)

169.    RG Steel repeats and realleges the allegations set forth in paragraphs 1 through 174 of this Complaint as if fully set forth herein.

170.    The SPA is a valid and binding contract.

171.    As set forth above, Severstal had an express contractual obligation to indemnify RG Steel for Losses caused by Defendants' breaches of the express representations and warranties they made in the SPA.

172.    Severstal's false representations and warranties have caused RG Steel to expend substantial attorneys' fees and other expenses.  These attorneys' fees and related expenses constitute an indemnifiable Loss under the SPA.

## RELIEF DEMANDED

WHEREFORE Plaintiff RG Steel respectfully requests that this Court enter judgment (i) in favor of RG Steel in an amount to be determined at trial, (ii) granting RG Steel the right or recoupment or set off against any amounts owing to Severstal, and (iii) declaring those things set forth in Paragraph 163 above, and awarding such other and further relief as this Court deems just and proper.

Dated:     New York, New York
           April 20, 2012

<div align="center">CADWALADER, WICKERSHAM & TAFT LLP</div>

By:  /s/ Martin L. Seidel
    Martin L. Seidel
    martin.seidel@cwt.com
    Joshua R. Weiss
    joshua.weiss.cwt.com
    Martin S. Krezalek
    martin.krezalek@cwt.com

    One World Financial Center
    New York, New York  10281
    Telephone: (212) 504-6000

    *Attorneys for Plaintiff*
    *RG Steel, LLC*

**EXECUTION COPY**

STOCK PURCHASE AGREEMENT

by and among

SEVERSTAL US HOLDINGS, LLC,

SEVERSTAL US HOLDINGS II, INC.,

SEVERSTAL SPARROWS POINT, LLC

and

RG STEEL, LLC

dated as of March 1, 2011

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF SHARES AND CLOSING ........................................1

| | | |
|---|---|---|
| Section 1.01 | Purchase and Sale of Shares | 1 |
| Section 1.02 | Deposit | 1 |
| Section 1.03 | Closing | 1 |
| Section 1.04 | Purchase Price Adjustment | 2 |

ARTICLE II REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND PARENTS .........................................................................................................5

| | | |
|---|---|---|
| Section 2.01 | Organization, Authority and Qualification | 6 |
| Section 2.02 | Capitalization | 7 |
| Section 2.03 | Subsidiaries; Investments | 7 |
| Section 2.04 | No Conflicts | 8 |
| Section 2.05 | Consents and Approvals | 8 |
| Section 2.06 | Financial Statements; No Undisclosed Liabilities | 8 |
| Section 2.07 | Litigation | 9 |
| Section 2.08 | Compliance with Laws | 9 |
| Section 2.09 | Taxes | 9 |
| Section 2.10 | Employee Benefits | 12 |
| Section 2.11 | Labor Matters | 14 |
| Section 2.12 | Real Property | 15 |
| Section 2.13 | Intellectual Property | 16 |
| Section 2.14 | Environmental Matters. | 17 |
| Section 2.15 | Absence of Certain Changes | 18 |
| Section 2.16 | Material Contracts | 20 |
| Section 2.17 | Customers and Suppliers | 21 |
| Section 2.18 | Foreign Corrupt Practices Act | 21 |
| Section 2.19 | [RESERVED] | 22 |
| Section 2.20 | Brokers | 22 |
| Section 2.21 | Assets | 22 |
| Section 2.22 | Receivables; Payables | 22 |
| Section 2.23 | Inventory | 22 |
| Section 2.24 | Insurance | 22 |
| Section 2.25 | Bank Accounts | 23 |
| Section 2.26 | Indebtedness | 23 |
| Section 2.27 | Disclaimer | 23 |

ARTICLE III REPRESENTATIONS AND WARRANTIES OF PURCHASER .......................23

| | | |
|---|---|---|
| Section 3.01 | Organization and Authority of Purchaser | 23 |
| Section 3.02 | No Conflicts | 23 |
| Section 3.03 | Governmental Consents and Approvals | 24 |
| Section 3.04 | Litigation | 24 |

Section 3.05     WARN Act ...................................................................................24
Section 3.06     RESERVED...................................................................................24
Section 3.07     Qualification to Purchase.............................................................24
Section 3.08     Union Matters ..............................................................................24
Section 3.09     Brokers.........................................................................................25
Section 3.10     Availability of Funds ...................................................................25
Section 3.11     Investigation by Purchaser...........................................................25

ARTICLE IV COVENANTS AND AGREEMENTS.........................................................26

Section 4.01     Conduct of the Business ..............................................................26
Section 4.02     Access to Information; Confidentiality .........................................27
Section 4.03     Regulatory and Other Authorizations; Notices and Consents............28
Section 4.04     Fulfillment of Conditions ............................................................29
Section 4.05     [RESERVED] ...............................................................................30
Section 4.06     Further Assurances; Post-Closing Cooperation.............................30
Section 4.07     Indemnification and Insurance .....................................................30
Section 4.08     Employee Benefit Matters ...........................................................30
Section 4.09     Books and Records; Access...........................................................32
Section 4.10     Credit and Performance Support Obligations.................................33
Section 4.11     Termination of Insurance Coverage ..............................................33
Section 4.12     Financing .....................................................................................33
Section 4.13     Corporate Name...........................................................................34
Section 4.14     Termination of Intercompany Agreements; Assumption of
                 Certain Contracts .......................................................................34
Section 4.15     Shared Contracts..........................................................................35
Section 4.16     [RESERVED].................................................................................36
Section 4.17     [RESERVED] ...............................................................................36
Section 4.18     Taxes............................................................................................36
Section 4.19     Future Dispositions......................................................................36
Section 4.20     Citicorp Credit Agreement ..........................................................37
Section 4.21     Tilden Pellet Agreement ...............................................................37

ARTICLE V TAX MATTERS....................................................................................37

Section 5.01     Parent Indemnification.................................................................37
Section 5.02     Purchaser Indemnification ...........................................................38
Section 5.03     Apportionment of Straddle Period Taxes ......................................38
Section 5.04     Refunds or Credits .......................................................................39
Section 5.05     Tax Returns..................................................................................40
Section 5.06     Mutual Cooperation .....................................................................40
Section 5.07     Contests........................................................................................40
Section 5.08     Tax Sharing Agreements ..............................................................41
Section 5.09     Transfer Taxes .............................................................................41
Section 5.10     Allocation of Purchase Price ........................................................41
Section 5.11     Employees.....................................................................................42
Section 5.12     Survival of Obligations and Sole Remedy.....................................42

ARTICLE VI CONDITIONS .................................................................................42

    Section 6.01    Conditions to the Obligations of Purchaser ........................................42
    Section 6.02    Conditions to the Obligations of Parent..............................................43

ARTICLE VII TERMINATION .............................................................................44

    Section 7.01    Termination.........................................................................................44
    Section 7.02    Distribution of Deposit ......................................................................45
    Section 7.03    Effect of Termination ........................................................................45

ARTICLE VIII INDEMNIFICATION AND SURVIVAL...........................................45

    Section 8.01    Survival of Representations, Warranties, Covenants and
                 Agreements ....................................................................................45
    Section 8.02    Indemnification...................................................................................45
    Section 8.03    Indemnity Procedures ........................................................................48
    Section 8.04    Tax Effect ..........................................................................................48
    Section 8.05    Insurance Offset.................................................................................49
    Section 8.06    Exclusivity .........................................................................................49
    Section 8.07    Article V to Apply to Taxes and Tax Returns ....................................49

ARTICLE IX DEFINITIONS..................................................................................49

    Section 9.01    Definitions .........................................................................................49

ARTICLE X MISCELLANEOUS ...........................................................................58

    Section 10.01    Assignment ......................................................................................58
    Section 10.02    Public Announcements .....................................................................59
    Section 10.03    Expenses ..........................................................................................59
    Section 10.04    Severability ......................................................................................59
    Section 10.05    No Third Party Beneficiaries............................................................59
    Section 10.06    Waiver..............................................................................................59
    Section 10.07    Governing Law .................................................................................60
    Section 10.08    Jurisdiction.......................................................................................60
    Section 10.09    Waiver of Jury Trial..........................................................................60
    Section 10.10    Specific Performance ........................................................................60
    Section 10.11    Headings ..........................................................................................60
    Section 10.12    Counterparts.....................................................................................61
    Section 10.13    Notices .............................................................................................61
    Section 10.14    Construction.....................................................................................62
    Section 10.15    Entire Agreement..............................................................................62

758323.10-Chicago Server 1A - MSW

Exhibits

| | |
|---|---|
| Exhibit A | Parent FIRPTA Certificate |
| Exhibit B | Purchaser Commitment Letters |
| Exhibit C | Form of Supply Agreement |
| Exhibit D | Form of Transition Services Agreement |
| Exhibit E | Note |
| Exhibit F | Deposit Escrow Agreement |

i

This STOCK PURCHASE AGREEMENT, dated as of March 1, 2011 is made and entered into by and among Severstal US Holdings, LLC, a Delaware limited liability company ("US Parent"), Severstal US Holdings II, Inc., a Delaware corporation ("Parent"), Severstal Sparrows Point, LLC, a Delaware limited liability company (the "Company") and RG Steel, LLC, a Delaware limited liability company ("Purchaser").  Capitalized terms not otherwise defined herein have the meanings set forth in Section 9.01 hereof.

WHEREAS, Parent owns all of the issued and outstanding equity interests of the Company (the "Shares");

WHEREAS, US Parent owns all of the issued and outstanding equity interests of Parent; and

WHEREAS, upon the terms and subject to the conditions set forth in this Agreement, Parent proposes to sell to Purchaser, and Purchaser desires to purchase from Parent, the Shares.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF SHARES AND CLOSING

Section 1.01   Purchase and Sale of Shares.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase from Parent, and Parent shall sell, assign, transfer and deliver to Purchaser, the Shares.  The aggregate consideration to be paid by Purchaser to Parent at the Closing for all of the Shares shall be (i) the Note, plus (ii) cash in the amount equal to the Initial Purchase Price (as adjusted pursuant to Section 1.04, the "Final Purchase Price").

Section 1.02   Deposit.  As of the date of this Agreement, Purchaser has delivered $10,000,000 by wire transfer of immediately available funds (the "Deposit Escrow Amount") to the Escrow Agent to be held and distributed by the Escrow Agent in accordance with the terms and conditions of the Deposit Escrow Agreement.

Section 1.03   Closing.

(a)   Upon the terms and subject to the conditions set forth in this Agreement, the purchase and sale of the Shares (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Drive, Chicago, Illinois 60606 or at such other place as Purchaser and Parent mutually agree in writing, at 10:00 A.M. local time, on the third (3rd) Business Day following the satisfaction or waiver of each of the conditions set forth in Article VI (excluding conditions that, by their terms, cannot be satisfied until the Closing, but the Closing shall be subject to the satisfaction or waiver of those conditions), or at such other

1

time or date as Purchaser and Parent may mutually agree in writing (the "Closing Date"); *provided* that Purchaser shall in no event be required to close earlier than March 31, 2011; *provided further*, that if (i) such Closing Date is after the later to occur of March 31, 2001 or three (3) Business Days after the satisfaction or waiver of each of the conditions set forth in Article VI (other than the execution and delivery of Exhibits C, D and E hereto) and (ii) Parent shall have delivered to Purchaser the certificate contemplated by Section 1.03(b)(iii)(G) hereof on or after the later to occur of March 31, 2011 or the third Business Day after the satisfaction or waiver of such conditions, as applicable, then the conditions to the obligations of Purchaser set forth in Sections 6.01(a), (b), (d) and, with respect to Section 6.01(e), the delivery set forth in Section 1.03(b)(ii)(G), shall be deemed satisfied as of the date of the delivery of such certificate, and Purchaser's obligation to purchase the Shares shall no longer be subject to any of the conditions set forth in Sections 6.01(a), (b), (d) and, with respect to Section 6.01(e), the delivery set forth in Section 1.03(b)(ii)(G). Unless the parties agree otherwise, the Closing shall be deemed to have occurred at 12:01 a.m. local time in each applicable jurisdiction on the Closing Date.

        (b)    At the Closing:

        (i)    Purchaser shall deliver (A) to the Escrow Agent, written instructions to distribute the Deposit Escrow Amount to Parent in accordance with the Deposit Escrow Agreement, (B) to Parent, the Note and the Initial Purchase Price, minus the Deposit Escrow Amount, by wire transfer of immediately available funds, free and clear of any withholdings or deductions, to one or more accounts as Parent may direct by written notice delivered to Purchaser by Parent at least two (2) Business Days before the Closing Date, (C) the Transition Services Agreement, duly executed by Purchaser, (D) the Supply Agreement, duly executed by Purchaser, (E) such documents regarding the corporate organization, existence, authorization and similar matters relating to Purchaser as Parent may reasonably request and (F) a certificate signed on behalf of Purchaser as to the matters set forth in Section 6.02(a); and

        (ii)    Parent shall deliver to Purchaser (A) a duly executed amendment to the limited liability company agreement of the Company, evidencing the transfer of the Shares to purchaser, (B) written resignations from each director of the Company and its Subsidiaries, (C) such documents regarding the corporate organization, existence, authorization and similar matters relating to Parent and the Company and its Subsidiaries as Purchaser may reasonably request, (D) the Transition Services Agreement, duly executed by Parent, (E) the Supply Agreement, duly executed by Parent, (F) a certificate, in the form of Exhibit A, to the effect that Purchaser is not required to withhold from the Purchase Price under section 1445 of the Code and (G) a certificate signed on behalf of Parent as to the matters set forth in Section 6.01(a).

        Section 1.04    Purchase Price Adjustment.

        (a)    *Initial Purchase Price.*

(i)   For purposes of determining the Initial Purchase Price payable by Purchaser at the Closing, not less than two (2) Business Days prior to the Closing Date, Parent shall, acting reasonably and in good faith, prepare and deliver to Purchaser a statement setting forth an estimate of (A) the Net Working Capital (determined in accordance with Section 1.04(b)(ii)) and (B) the Net Citicorp Indebtedness, including in reasonable detail the basis for the computation thereof, as of the opening of business on the Closing Date (the "Effective Time"). Such Statement shall be referred to as the "Estimated Closing Statement".

(ii)   The "Initial Purchase Price", as used in this Agreement, shall mean $125,000,000, *plus* the amount by which, if any, the Net Working Capital set forth on the Estimated Closing Statement (the "Estimated Net Working Capital") is greater than $450,000,000; or, as the case may be, *minus* the amount by which, if any, the Estimated Net Working Capital is less than $450,000,000; and *plus* the amount by which, if any, the Net Citicorp Indebtedness set forth on the Estimated Closing Statement (the "Estimated Net Citicorp Indebtedness")is less than $311,041,000; or, as the case may be, *minus* the amount by which, if any, the Estimated Citicorp Indebtedness is greater than $311,041,000.

(b)   Final Purchase Price Adjustments.

(i)   As soon as practicable after the Closing Date, but not later than sixty (60) days after the Closing Date, Parent shall prepare and deliver to Purchaser a statement setting forth (A) the Net Working Capital (determined in accordance with Section 1.04(b)(ii)) and (B) the outstanding Indebtedness under the Citicorp Credit Agreement, including in reasonable detail the basis for the computation thereof, as of the Effective Time (the "Closing Statement").  During such sixty (60) day period and the period of any dispute with respect to the application of this Section 1.04(b), Purchaser shall cooperate with Parent in the preparation of the Closing Statement and the investigation of any disputed item, including by providing Parent and its Representatives with reasonable access to the books, records and personnel of Purchaser, the Company and its Subsidiaries.

(ii) For purposes of this Agreement, the term "Net Working Capital" means the difference between the Company's and the Subsidiaries' consolidated (A) accounts receivable (excluding intercompany receivables owed to the Company and its Subsidiaries by Parent and its Affiliates (other than the Company or its Subsidiaries)) and inventories and (B) accounts payable (excluding intercompany payables owed by the Company and its Subsidiaries to Parent and its Affiliates (other than the Company or its Subsidiaries) but including book overdrafts), determined in accordance with GAAP consistently applied and following the policies, procedures, principles and methods employed in preparing the Company's balance sheet as of December 31, 2010 included in the Financial Statements, and shall be calculated in the manner set forth on Schedule 1.04(b)(ii) hereto; *provided, however*, that notwithstanding anything to the contrary contained in this Agreement, any accounts payable owed

by the Company and its Subsidiaries to Mountain State Carbon, LLC shall be included as accounts payable for purposes of clause (B) of this Section 1.04(b)(ii).

(iii)   Purchaser shall have thirty (30) days after delivery of the Closing Statement by Parent to review the same and to deliver to Parent a written statement thereon (the "Protest Notice"). The Protest Notice shall list those items included in the Closing Statement, if any, to which Purchaser takes exception and Purchaser's proposed adjustment, including in reasonable detail the basis for the computation thereof. The failure of Purchaser to deliver such Protest Notice within such thirty (30) day period following delivery of the Closing Statement will constitute Purchaser's acceptance of the Closing Statement as prepared by Parent. If Purchaser timely delivers a Protest Notice to Parent and Parent does not give Purchaser notice of its objections to such Protest Notice within thirty (30) days following receipt of such Protest Notice, Parent shall be deemed to have accepted the Closing Statement as adjusted by Purchaser in the Protest Notice. If Parent objects to the Protest Notice within said thirty (30) day period following delivery to Parent of the Protest Notice (the adjustments to which Parent objects being referred to herein as the "Contested Adjustments"), Parent and Purchaser shall attempt to resolve the dispute regarding the Contested Adjustments. If a final resolution thereof is not reached within ten (10) Business Days of Purchaser's receipt of Parent's objections thereto, either Parent or Purchaser shall thereafter be entitled to refer any remaining Contested Adjustments to an Independent Accounting Firm acceptable to Parent and Purchaser or, in the absence of agreement on the Independent Accounting Firm within five (5) days of notice by either Parent or Purchaser of intent to initiate such a referral, to PricewaterhouseCoopers LLP (who will thereafter be considered the "Independent Accounting Firm"). If there is such a referral to an Independent Accounting Firm, each of Parent and Purchaser agree, if requested by the Independent Accounting Firm, to execute a reasonable engagement letter and shall submit to the Independent Accounting Firm not later than ten (10) Business Days after its appointment, a written statement summarizing its position on the Contested Adjustments, together with such supporting documentation as it deems necessary. The Independent Accounting Firm shall act as an arbitrator to determine, based solely on the materials submitted and presentations by Parent and Purchaser, and not by independent review, only the Contested Adjustments that have not been settled by negotiation and shall be instructed to render its decision within thirty (30) days of its appointment or as soon thereafter as is reasonably practicable. The decision of the Independent Accounting Firm as to the Contested Adjustments shall be final and binding on, and shall not be subject to appeal by, Parent or Purchaser and may be entered and enforced by any court having jurisdiction. The Closing Statement shall be revised as necessary to reflect the decision of the Independent Accounting Firm and the other modifications thereto previously agreed by Parent and Purchaser. Each of Parent and Purchaser shall bear its own expenses incurred in connection with the resolution of the Closing Statement, and the fees and expenses of the Independent Accounting Firm shall be shared equally by Parent, on the one hand, and Purchaser, on the other hand. The term "Final Closing Statement," as used in this Agreement, shall

4

mean the definitive Closing Statement accepted by Purchaser or agreed to by Purchaser and Parent or the definitive Closing Statement resulting from the determinations made by the Independent Accounting Firm in accordance with this Section 1.04(b)(iii) (in addition to those items theretofore accepted by Purchaser or agreed to by Purchaser and Parent).

(iv)   Within five (5) Business Days of the determination of the Final Closing Statement:

(1)   if the Net Working Capital set forth on the Final Closing Statement (the "Final Net Working Capital") is greater than the Estimated Net Working Capital, Purchaser shall pay to Parent the amount of such excess; or

(2)   if the Final Net Working Capital is less than the Estimated Net Working Capital, Parent shall pay to Purchaser the amount of such shortfall.

(v)   Within five (5) Business Days of the determination of the Final Closing Statement:

(1)   if the Net Citicorp Indebtedness set forth on the Final Closing Statement (the "Final Net Citicorp Indebtedness") is less than the Estimated Net Citicorp Indebtedness, Purchaser shall pay to Parent the amount of such shortfall; or

(2)   if the Final Net Citicorp Indebtedness is greater than the Estimated Net Citicorp Indebtedness, Parent shall pay to Purchaser the amount of such excess.

(vi)   Any payments pursuant to this Section 1.04(b) shall be made by wire transfer of immediately available funds to the account or accounts designated by Parent or Purchaser, as applicable.  Any payment required to be made by a party hereto pursuant to this Section 1.04(b) may be made net of the amount of any lesser payment required to be paid to such party pursuant to this Section 1.04(b).

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND PARENTS

Except as otherwise set forth in a schedule to any particular representation and warranty (collectively, the "Disclosure Schedules"), the Company and Parents represent and warrant to Purchaser that all of the statements contained in this Article II are true as of the date of this Agreement (or, if made as of a specified date, as of such date).  Each exception set forth in the Disclosure Schedules is identified by reference to, or has been grouped under a heading referring to, a specific individual section or subsection of this Agreement; provided, however, that the inclusion of any item referenced in one section or subsection of the Disclosure Schedules shall be deemed to refer to any other section or subsection of the Disclosure Schedules (and

5

accordingly to the applicable sections or subsections of this Agreement which contain references to the Disclosure Schedules), whether or not an explicit cross-reference appears, if the applicability of such item to the other section or subsection is reasonably apparent. The inclusion of any information in the Disclosure Schedules shall not be deemed to be an admission or evidence of the materiality of such item, nor shall it establish a standard of materiality for any purpose whatsoever.

Section 2.01    Organization, Authority and Qualification.

(a)    The Company is a limited liability company, duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as conducted at the date of this Agreement. The Company is duly licensed or qualified to do business and, in jurisdictions where such concept is recognized, is in good standing (or its local equivalent) in each jurisdiction in which the properties owned or leased by it or the operations of its business make such licensing or qualification necessary or desirable, except to the extent that the failure to be so licensed, qualified or in good standing individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect. The execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder and the consummation by the Company of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Company. This Agreement has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by Purchaser, this Agreement is a legal, valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally.

(b)    Parent is a corporation, duly organized, validly existing and in good standing under the Laws of the State of Delaware. Parent has all necessary power and authority to enter into, execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement by Parent have been duly authorized by all requisite action on the part of Parent. This Agreement has been duly executed and delivered by Parent and, assuming due authorization, execution and delivery by Purchaser, this Agreement is a legal, valid and binding obligation of Parent, enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally. Parent has the requisite power and authority to cause the Company to take all actions contemplated to be taken by the Company under this Agreement.

(c)    US Parent is a limited liability company, duly formed, validly existing and in good standing under the Laws of the State of Delaware. US Parent has all necessary power and authority to enter into, execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement by US Parent have been duly authorized by all requisite action on the part of US Parent. This Agreement has been duly executed and delivered by US Parent and, assuming due authorization, execution and delivery by Purchaser, this Agreement is a legal, valid and binding obligation of US Parent,

6

enforceable against it in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and other similar laws of general application affecting enforcement of creditors' rights generally.

        Section 2.02    Capitalization.  All of the Shares are owned by Parent.  The Shares are duly authorized, validly issued, fully paid and non-assessable.  There are no outstanding options, warrants, rights, commitments, preemptive rights or agreements of any kind to which the Company is a party or by which the Company is bound which would obligate the Company to issue, deliver, purchase or sell any additional shares of capital stock, units, membership, or other equity or profit interests of any kind in the Company.  There are no outstanding contractual obligations of the Company to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person (other than a Subsidiary).  There are no voting trusts, stockholder agreements, proxies or other agreements or understandings (other than this Agreement) in effect with respect to the voting or transfer of any of the Shares.  Upon consummation of the transactions contemplated by this Agreement and registration of the Shares in the name of Purchaser in the records of the Company, Purchaser will own all of the issued and outstanding limited liability company interests of the Company free and clear of all Encumbrances.  Upon consummation of the transactions contemplated by this Agreement, the Shares will be fully paid and nonassessable.

        Section 2.03    Subsidiaries; Investments.  Except as set forth on Schedule 2.03, the Company owns all of the issued and outstanding capital stock or limited liability company interests of its Subsidiaries, free and clear of all Encumbrances.  Schedule 2.03 lists each of the Subsidiaries of the Company, together with the number of issued and outstanding shares of capital stock or limited liability company interests thereof and the identity of the holder of each share of capital stock or limited liability company interest.  All of such shares of capital stock or limited liability company interests are duly authorized, validly issued, fully paid and non-assessable.  There are no outstanding contractual obligations of any of the Company's Subsidiaries to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person (other than a Subsidiary).  Except as set forth on Schedule 2.03, there are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the shares of capital stock or limited liability company interests of any of the Subsidiaries of the Company.  Other than the Subsidiaries listed on Schedule 2.03, there are no other corporations, partnerships, joint ventures or other entities in which the Company or any Subsidiary thereof owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.  Except as set forth on Schedule 2.03, there are no outstanding options, warrants, rights, commitments, preemptive rights or agreements of any kind to which the Company or any of its Subsidiaries is a party or by which any of them is bound which would obligate any of them to issue, deliver, purchase or sell any additional shares of capital stock, units, membership, or other equity or profit interests of any kind in any of the Subsidiaries of the Company.  Each Subsidiary (a) is a corporation or limited liability company, as applicable, duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation or formation; (b) has all requisite corporate or limited liability company power, as applicable, to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as conducted at the date of this Agreement; and (c) is duly licensed or qualified to do business and, in jurisdictions where such concept is recognized, is in good standing (or its local equivalent)

7

in each jurisdiction in which the properties owned or leased by it or the operations of its business make such licensing or qualification necessary or desirable, in each case, in all material respects, except, in the case of each of the Company, Severstal Wheeling, Inc. and Severstal Warren, LLC, where the failure to be so existing and in good standing, to have such power and authority or to be so licensed, qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. As of the Closing Date, the net members' equity of Mountain State Carbon, LLC shall be not less than $225,000,000.

Section 2.04    No Conflicts.  Assuming that all Consents contemplated by Section 2.05 have been obtained, and except as may result from any facts or circumstances relating to Purchaser or any of its Affiliates, the execution, delivery and performance of this Agreement by Parent and the Company do not and shall not: (a) violate, conflict with or result in the breach of the organizational documents of Parent, the Company or any of its Subsidiaries; (b) conflict with or violate in any material respect any Law or Governmental Order applicable to Parent, the Company or any of its Subsidiaries, as applicable, or their respective properties; or (c) violate, conflict with or result in a material breach of or material default under (with or without due notice or lapse of time or both) any of the terms, conditions or provisions of any Material Contract.

Section 2.05    Consents and Approvals.  The execution, delivery and performance of this Agreement by Parents and the Company do not and shall not require any Consent of any Governmental Authority or any other Person under any Material Contract, except: (a) pursuant to the requirements of the HSR Act or under the antitrust or competition Laws of applicable foreign jurisdictions; (b) for any notification, or where appropriate, consultation or negotiations with a labor union, labor board or relevant Governmental Authority concerning the transactions contemplated hereby; (c) as may be necessary as a result of any facts or circumstances relating to Purchaser or any of its Affiliates; or (d) for the Consents set forth in Schedule 2.05.

Section 2.06    Financial Statements; No Undisclosed Liabilities.

(a)    Schedule 2.06(a) contains the following financial statements: (i) the financial statements of the Company and each of its Subsidiaries as of December 31, 2009 (including, as applicable, all notes thereto), consisting of the balance sheet and the related consolidated statement of operations, changes in shareholders equity and comprehensive income and cash flows for the fiscal year then ended, as follows: (1) Severstal Sparrows Point, LLC (audited), (2) Severstal Wheeling, Inc. (reviewed) and (3) Severstal Warren, LLC (f/k/a Severstal Warren, Inc.) (unaudited and unreviewed);and (ii) the unaudited consolidated financial statements of the Company and its Subsidiaries as of December 31, 2010, consisting of the balance sheet and the related consolidated statements of earnings and cash flows for the twelve-month period then ended (collectively, the "Financial Statements"). The Financial Statements have been prepared in accordance with GAAP, consistently applied throughout the periods indicated (except as set forth in the notes attached thereto) and present fairly, in all material respects, the consolidated financial position of the Company and its Subsidiaries as of the dates thereof and the results of operations and cash flows of the Company and its Subsidiaries for the periods covered thereby, except that the unaudited financial statements contained in the Financial Statements omit footnotes and are subject to normal, recurring year-end adjustments and accruals.

(b)    The Company and its Subsidiaries do not have any Liabilities that would be required to be reflected or reserved against in a consolidated balance sheet of the Company and its Subsidiaries, prepared in accordance with GAAP as applied in preparing the balance sheets of the Company and its Subsidiaries, as included in the Financial Statements, except for (i) Liabilities incurred in the ordinary course of business, consistent with past practice, after December 31, 2010; (ii) Liabilities and obligations disclosed, reflected or reserved for in the Financial Statements; (iii) Liabilities and obligations incurred in connection with the transactions contemplated by this Agreement or otherwise as contemplated or permitted hereby; and (iv) Liabilities discharged or paid in full prior to the date hereof in the ordinary course of business consistent with past practice.

Section 2.07    Litigation.  Except as set forth on Schedule 2.07, as of the date hereof, there are no (i) Actions pending or, to the Knowledge of the Company, threatened, against the Company or any Subsidiary by or before any Governmental Authority or (ii) unsatisfied judgments or outstanding Governmental Orders against the Company or any of its Subsidiaries.

Section 2.08    Compliance with Laws.  Except as set forth on Schedule 2.08, each of the Company and its Subsidiaries is in compliance in all material respects with all Laws applicable to the Company or its Subsidiaries or any of their respective assets and properties.

Section 2.09    Taxes.  With respect to taxable periods for which the statute of limitations has not expired or except as set forth on Schedule 2.09:

(a)    Each of the Company and its Subsidiaries has timely filed or will timely file (or there have been or will be timely filed on its behalf) all Tax Returns required to be filed by it before the Closing Date, except for such Tax Returns for which the failure to file would not, individually or in the aggregate, reasonably be expected to materially affect any of the Company or its Subsidiaries in an adverse manner; all such Tax Returns are or will be complete and accurate; and each of the Company and its Subsidiaries has withheld and paid over to the appropriate Taxing Authority all Taxes required to have been withheld and paid over by them, and have complied in all respects with all information reporting and backup withholding requirements in connection with amounts paid or owing to any employee, creditor, independent contractor or other Person.

(b)    There are no outstanding requests by the Company or any of its Subsidiaries for any extension of time within which to file any Tax Return or within which to pay any Taxes.

(c)    All Taxes of the Company and its Subsidiaries due and payable on or prior to the Closing Date have been or will be timely paid, except for any such Taxes being contested or challenged in good faith that are not in excess of the reserve for Tax liabilities reflected on the Books and Records of the Company or its Subsidiaries as adjusted through the Closing Date for current Taxes payable in the ordinary course of business.  Schedule 2.09(c) lists each item of Tax (and the amount of such Tax) that is being contested or challenged by the Company or its Subsidiaries in good faith for which the reserve amount is in excess of $500,000. The aggregate amount of all items of Tax that are being contested or challenged by the Company

or its Subsidiaries in good faith and that are not listed on Schedule 2.09(c) does not exceed $500,000.

(d)     There are no pending audits, claims, actions, suits, proceedings or investigations with respect to Taxes of the Company or any of its Subsidiaries, and neither the Company nor any of its Subsidiaries has been notified of any potential such audits, claims, actions, suits, proceedings or investigations.

(e)     Each assessed deficiency resulting from any audits, claims, actions, suits, proceedings or investigations with respect to Taxes of the Company or any of its Subsidiaries has been timely paid and fully satisfied.  Schedule 2.09(e) lists each ongoing audit with respect to the Tax Returns of the Company or any Subsidiary that may reasonably result in tax liabilities in excess of $500,000.  Excluding audits set forth on Schedule 2.09(e), there are no material ongoing audits with respect to the Tax Returns of the Company or any Subsidiary that may reasonably result in tax liabilities in excess of $500,000 in the aggregate.

(f)     Neither the Company nor any of its Subsidiaries has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(g)     Neither the Company nor any of its Subsidiaries will be required to include a material item of income in, or exclude a material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:  (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) "closing agreement" as described in Section 7121 of the Code (or any comparable or similar provisions of applicable Law) executed on or prior to the Closing Date; (iii) election pursuant to Section 108(i) of the Code made effective on or prior to the Closing Date; (iv) intercompany transaction or excess loss account described in Treasury Regulations under Section 1502 of the Code (or any comparable or similar provisions of applicable Law); (v) installment sale or open transaction disposition made on or prior to the Closing Date; or (vi) prepaid amount received on or prior to the Closing Date.

(h)     No Taxing Authority has claimed or asserted that the Company or any of its Subsidiaries is subject to an amount of Tax that exceeds $1,000 in any jurisdiction where neither the Company nor any Subsidiary files Tax Returns.

(i)     Neither the Company nor any of its Subsidiaries is a party to (or is bound by) any Tax allocation, indemnification or sharing agreement, or any similar agreement, arrangement or practice with respect to Taxes, with any Person that is not one of the Company or its Subsidiaries except to the extent that such agreement has no force after the Closing Date. Neither the Company nor any of its Subsidiaries has any actual or potential liability for Taxes of any Person other than the Company or any of its Subsidiaries (i) under Treasury Regulation Section 1.1502-6 (or any comparable or similar provisions of applicable Law, including any arrangement for group or consortium relief), (ii) as a transferee or successor or (iii) by contract.

(j)     All transactions between and among the Company and any of its Subsidiaries have been made at arm's length, and all such transactions have been conducted

while the Company and its Subsidiaries have been members of a single consolidated group for federal income tax purposes.  The Company has made available to Purchaser for inspection complete and correct copies of (i) all material Tax Returns of the Company and each of its Subsidiaries for all taxable periods for which the applicable statute of limitations has not yet expired; and (ii) all other material Tax documents (including revenue agent reports, private letter rulings and pending ruling requests, information document requests, notices of proposed deficiencies, protests, petitions, settlement agreements, and  "closing agreements" as described in Section 7121 of the Code (or any comparable or similar provisions of applicable Law)) submitted by, received by or agreed to by or on behalf of the Company or any of its Subsidiaries for all taxable periods for which the applicable statute of limitations has not yet expired.

(k)    Neither the Company nor any of the Subsidiaries has entered into, has any liability in respect of, or has any filing obligations with respect to, any "reportable transactions," as defined in Section 1.6011-4 of the Treasury Regulations.  Neither the Company nor any of its Subsidiaries has constituted (or will constitute) a "distributing corporation" or a "controlled corporation" (in each case, within the meaning of Section 355(a)(1) of the Code) (i) in the three (3) years prior to the Closing Date or (ii) in a distribution that could otherwise constitute part of a "plan" or "series of related transactions" (within the meaning of Section 355(e) of the Code) in conjunction with this Agreement.  Except as set forth in Schedule 2.09(k), neither the Company nor any of its Subsidiaries has filed an Internal Revenue Service Form 8832 or otherwise elected to change its classification for federal income tax purposes.

(l)    Parent is not a "foreign person" within the meaning of Section 1445 of the Code.

(m)    Neither the Company nor any Subsidiary has ever (i) made an election under Section 1362 of the Code to be treated as an S corporation for federal income tax purposes, or (ii) made any similar election under any comparable provisions of applicable Law.

(n)    There is no power of attorney given by or binding upon the Company or any Subsidiary with respect to Taxes for any period for which the statute of limitations (including any waivers or extensions) has not yet expired.

(o)    There are no liens for Taxes against the Company's or any of its Subsidiaries' assets, except for statutory liens for Taxes (i) not yet due and payable or (ii) being contested in good faith and for which the Company or its Subsidiaries (as applicable) have established adequate reserves, in accordance with GAAP, on their Books and Records as adjusted through the Closing Date.  Schedule 2.09(o) lists each lien for Taxes against the Company or any of its Subsidiaries (and the amount of Tax with respect to which such lien is imposed), other than liens for Taxes not yet due and payable and with respect to Taxes that do not exceed $500,000.  The aggregate amount of all liens for Taxes (excluding liens for Taxes not yet due and payable) not listed on Schedule 2.09(o) does not exceed $500,000.

(p)    The Company is and has always been treated as a disregarded entity for federal income tax purposes and has not elected under Treasury Regulations Section

11