UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

RG STEEL, LLC,

               Plaintiff,               13 Civ. 1540

   -against-                      OPINION

SEVERSTAL US HOLDINGS, LLC and SEVERSTAL
US HOLDINGS II, LLC,

               Defendants.

------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____           │
│ DATE FILED: 1-16-14              │
└─────────────────────────────────┘
```

A P P E A R A N C E S:


      Attorneys for the Defendants Severstal US Holdings,
      LLC and Severstal US Holdings II, Inc.

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      Four Times Square
      New York, NY 10036
      By:  Scott D. Musoff, Esq.

      SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
      155 North Wacker
      Chicago, IL 60606
      By:  Albert L. Hogan, III, Esq.
          Amy L. Van Gelder, Esq.
          Andrew J. Fuchs, Esq.


      Attorneys for Plaintiff RG Steel

      WILKIE FARR & GALLAGHER LLP
      787 Seventh Avenue
      New York, NY 10019
      By:  Brian E. O'Connor, Esq.
          Benjamin P. McCallen, Esq.
          Joshua M. Troy, Esq.

**Sweet, D.J.**

Defendants Severstal US Holdings, LLC ("SUSH") and Severstal US Holdings II, Inc. ("SUSH II") (collectively "Severstal" or "Defendants") move pursuant to Rule 12(b)(6) to partially dismiss the Complaint of Plaintiff RG Steel ("RG Steel" or Plaintiff").

For the reasons set forth below, Defendants' motion is granted in part and denied in part.

**Procedural History**

Plaintiff initially commenced an action in this Court on March 30, 2012.  After Defendants disputed the allegations of subject matter jurisdiction, Plaintiff voluntarily dismissed the action on April 20, 2012.

Plaintiff refiled the action the same day in the Supreme Court of the State of New York.  Prior to Defendants filing their answer, Plaintiff and affiliated entities filed for protection under Chapter 11 of the Bankruptcy Code, and the

1

State Court stayed the action.  By Notice of Removal dated March 7, 2013, RG Steel removed the action to this court.

Plaintiff filed the Amended Complaint ("Complaint") on June 7, 2013.  The Complaint alleges five independent causes of action and seeks to recover for losses and/or damages sustained in connection with RG Steel's purchase of certain steel mills from Defendants pursuant to the Stock Purchase Agreement (the "SPA") entered into in 2011, as well as certain declaratory relief.

On July 22, 2013, Defendants filed the motion to dismiss.  This motion was heard and marked fully submitted on October 2, 2013.

**Facts**

1. The Parties and the SPA

RG Steel is a Delaware limited liability company that manufactures a variety of steel mill products, including hot-rolled, cold-rolled, and coated sheets, and tin mill products. SUSH is a Delaware limited liability company.  It is the sole owner of the issued and outstanding equity interests of SUSH II,

2

a Delaware corporation and former owner of the equity interests
of Severstal Sparrows Point, LLC ("Severstal Sparrows Point").
SUSH and SUSH II are subsidiaries of Severstal International, a
global steelmaker which has operations in Russia, the United
States and elsewhere.

RG Steel, SUSH, SUSH II and Severstal Sparrows Point
entered into a March 1, 2011 SPA, which provided that RG Steel
would purchase the equity in three U.S.-based steel companies
from SUSH. The facilities are located in Sparrows Point,
Maryland, Warren, Ohio and Wheeling, West Virginia and were
acquired by Severstal between May 2008 and August 2008. In
connection with the transaction, RG Steel purchased all of the
equity of Severstal Sparrows Point, which in turn owned all of
the outstanding equity in Severstal Warren LLC ("Warren" or
"Severstal Warren") and Severstal Wheeling Inc. ("Wheeling").
(Compl. ¶ 7; SPA §§ 1.01, 1.04.)  In exchange, RG Steel agreed
to the following payment schedule: (1) $125 million in cash,
subject to a purchase price adjustment based on the amount of
working capital at the company at closing (*Id.* ¶ 8.); (2) $100
million in the form of a note (the "Note"), the principal of
which was due five years after closing (*id.*); (3) repayment of
$317 million of third-party bank debt owed by the Severstal
entities (*id.*) and (4) $36 million in cash to be paid to two

3

Severstal subsidiaries within one year of closing.  (*Id.*)  The
transaction closed on March 31, 2011.  (Compl. ¶ 37.)

1. The Purchase Price

     Section 1.01 of the SPA provides that the "aggregate
consideration to be paid by [RG Steel] at the Closing . . .
shall be (i) the Note, plus (ii) cash in the amount equal to the
Initial purchase Price (as adjusted pursuant to Section 1.04,
the Final Purchase Price)."

     The Note has a principal amount of $100 million, with
a maturity date of March 21, 2016, and quarterly interest
payments due beginning on June 30, 2012, until the entire
principal amount is repaid in full.  (Exhibit 1, § 1.1.)  The
Note also sets forth certain mandatory prepayment events that
require immediate payment of the Note in full, including, for
example, a change of control or certain sales, transfers, and
dispositions of RG Steel's interest in the acquired businesses.
(Exhibit 1 Preamble, § 1.5.)  In addition, upon the occurrence
of an event of default, including RG Steel's bankruptcy,
Severstal may declare all or a portion of the Note immediately
due and payable.  (*Id.* §§ 2.1, 2.3.)

Section 1.04(a) of the SPA defines the Initial Purchase Price as $125 million, subject to an upward or downward adjustment based on the acquired business's net work capital and certain indebtedness as of the Closing Date, also known as the "Effective Time," as compared with baseline amounts set forth in the SPA.  (SPA § 1.04.)  The SPA provides for two phases of this adjustment.  First, pursuant to a calculation two business days before the Closing, the Initial Purchase Price was subject to an initial upward or downward adjustment based on Severstal's estimate of the net working capital and certain indebtedness as of the Closing Date, as compared with baseline amounts set forth in the SPA.  (*Id.*)  The estimates of net working capital and indebtedness resulted in RG Steel paying only $85 million at the Closing.  *Several US Holdings LLC v. RG Steel, LLC*, Case No. 11-cv-6922 (RWS), 865 F. Supp. 2d 430 (S.D.N.Y. 2012).

Second, as is typical with stock purchase agreements, to take into account additional information that would become available shortly after Closing, the SPA provides for another, final adjustment to the purchase price based on the difference between final calculations of net working capital and certain indebtedness, and Severstal's estimate of net working capital and certain indebtedness of Severstal Sparrows Point and its

5

subsidiaries, as of the Closing Date.  (SPA § 1.04(b).) The
second adjustment is conducted through a multi-step exchange of
calculations between the parties and yields the Final Purchase
Price.  (*Id.*)


    2. The Arbitration Process


          In the event that the parties were unable to agree on
the amount of this final adjustment, Article I of the SPA
provides for either party to refer their disputes to an
independent accounting firm. (*Id.* §§ 1.04(b)(iii) and (iv).) The
parties would then use the independent accounting firm's
resolution of their disputes to calculate the Final Purchase
Price.  (*Id.* §§ 1.04(a)(i), (b)(iii), and (b)(iv).)


          In this case, at the conclusion of the parties'
exchange of calculations, RG Steel proposed adjustments to the
final purchase price that could, if accepted, essentially reduce
the cash purchase price to zero.  Severstal disputed the
validity of nearly all of these purported adjustments because
under Severstal's calculation of the purchase price adjustment,
RG Steel would owe it $29 million. *See Severstsal US Holdings
LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430 (S.D.N.Y. 2012).  On
September 3, 2011, RG Steel notified Severstal that it was

referring the parties' disputes to arbitration pursuant to
Section 1.04(b)(iii) of the SPA. *Id.* at 431.

The parties selected an individual within the
independent accounting firm to serve as arbitrator and
negotiated and executed an engagement letter.  On December 27,
2011, the independent accounting firm issued a schedule for the
arbitration, including a staggered exchange of submissions and a
decision date of May 11, 2012.  (Exhibit 2.)  On March 8, 2012,
prior to rendering a final decision, the independent accounting
firm resigned as arbitrator due to a conflict of interest
involving RG Steel.  (Compl. ¶ 81.)

On May 31, 2012, RG Steel filed a voluntary petition
for relief under Chapter 11 of the United States Code in the
United States District Court for the District of Delaware.
(Compl. ¶ 1.)  Pursuant to the bankruptcy stay, the arbitration
was suspended for approximately one year until recently when the
parties worked to locate and engage a new arbitrator.  The
parties have agreed upon a schedule that concludes the
arbitration in 2013.  (Compl. ¶ 81.)

3. Representations and Warranties

7

In negotiating the SPA, the parties bargained for and obtained certain representations and warranties. (*Id.* ¶ 8.)  In particular, the preamble to Article II of the SPA provides that, "[e]xcept as otherwise set forth in a schedule to any particular representation and warranty (collectively, the "Disclosure Schedules"), the Company and Parents represent and warrant to Purchaser that all of the statements contained in this Article II are true as of the date of this Agreement. . . ." (*Id.* ¶ 30.)

Section 8.02 of the SPA provides that Defendants must indemnify and hold harmless RG Steel for any breach of representation or warranty made by Severstal in Article II or failure to perform or fulfill any covenant contained in the SPA:

> Subject to the provisions of this Article II, from and after the Closing, Parents shall, jointly and severally, indemnify Purchaser and its Affiliates . . . in respect of, and hold them harmless from and against, any and all Losses suffered, incurred or sustained . . . by reason of or resulting from (i) any inaccuracy or breach of a representation or warranty of Parents and the Company contained in Article II of this Agreement or (ii) any nonfulfillment of or failure to perform any covenant or agreement on the part of any of the Parents or, with respect to covenants or agreements to be performed prior to the Closing, the Company, contained in this Agreement.

8

(Compl. ¶ 32; SPA § 8.02.) "Loss" is defined as "any and all damages, Liabilities, costs and expenses (including reasonable attorneys' fees)."  (Compl. ¶¶ 32-33; SPA § 9.01(a).)

        Depending on the specific section, the representations and warranties that form the basis for indemnification claims expire either 18 months after the Closing, five years after the Closing, or 30 days after the applicable statute of limitations expires, or never.  (*Id.* § 8.01.) If a Claim Notice or Indemnity Notice was timely provided, a representation or warranty does not expire until the related indemnification claim is resolved. (*Id.*)

        Sections 8.02(c)-(h) and 8.03-8.07 set forth additional detailed provisions applicable to the parties' indemnification obligations and detailed procedures for making an indemnification claim.  As part of those procedures, Section 8.03 sets forth the process for delivering a Claim Notice to the indemnifying party and the process for the indemnifying party to assume control of the defense of a third-party action.  Section 8.06 provides that an indemnification claim set forth in Article VII shall be the exclusive remedy of the parties "for any inaccuracy in any representation or warranty, misrepresentation, breach of warranty or nonfulfillment or failure to be performed

9

of any covenant or agreement contained" in the SPA.  (*Id.* §
8.06.)

In Section 2.16, Severstal represented and warranted
that Schedule 2.16 contained an accurate list of all "Material
Contracts" to which Sparrows or an affiliate were a party.  (SPA
§ 2.16(a)-(n).)  A Material Contract is one that "involves the
payment or receipt of an amount in excess of $1,000,000."  (*Id.*)

Plaintiff contends that Defendants represented to RG
Steel that it was assuming the benefits of ten-year coke supply
agreements that provided the steel ingredient coke at relatively
fixed conversion prices for the life of the agreements, (*see*
Compl. ¶¶ 44-46), but that RG Steel did not receive the
contractual benefits for which it paid. (*Id.* ¶ 53.) The
agreements include: the Haverhill Agreement, the Jewell
Agreement, and the Service Provision Agreement (collectively,
the "Coke Supply Agreements").  Defendants, purportedly in
violation of these warranties, failed to disclose a letter dated
January 31, 2011 (the "January 31 Letter"), from ArcelorMittal
Cleveland Inc. ("ArcelorMittal"), through whom Sparrows
purchased coke, in which ArcelorMittal stated that the favorable
fixed-price provision had been removed and the price to be paid
by Sparrows was substantially higher.  (*Id.* ¶ 50.)

10

ArcelorMittal raised the price from $22.00 fixed/$20.90 variable and $10.10fixed/$22.00 variable under the Haverhill and Jewell Agreements, respectively, to $37.50 fixed/$37.50 variable under both. (*Id.* ¶ 51.) Plaintiff alleges that this caused RG Steel to incur an unexpected liability of $80.7 million. (*Id.*)

Plaintiff also asserts that Defendants failed to disclose the existence of a transportation contract pursuant to which Sparrows was burdened with an additional future obligation of $1,425,450.00. (Compl. ¶ 65.) Specifically, Defendants provided Plaintiff with a 2007 contract in which a Sparrows subsidiary, WCI Steel, Inc. (the predecessor-in-interest to Severstal Warren), agreed to transport no less than 215,000 tons of coke per year for 15 years with Norfolk Southern Railway Company ("Norfolk Southern") and its subsidiary railroads (the "2007 Transportation Contract"). (*Id.* ¶¶ 60-61.) Defendants purportedly did not disclose that the 2007 Transportation Contract was terminated in light of Severstal Warren's breach and replaced with a contract executed December 1, 2010 ("the "2010 Transportation Contract"). (*Id.* ¶¶ 62-63.) The 2010 Transportation Contract specified that "no tonnage was shipped under [the 2007 Transportation Contract] in 2009, resulting in a 215,000 ton deficit and an obligation to pay [Norfolk Southern] $1,425,450" (the "Accrued Liability"), and further provided that

11

Norfolk Southern "shall forgo collection of the Accrued
Liability and 215,000 tons is hereby added to the Prior Minimum
Volume for 2024." (*Id.* ¶ 64.)

Further, Plaintiff alleges that Defendants failed to
adequately disclose the unfavorable terms of the amendment to a
pellet purchase contract between Sparrows and Cliffs Sales
Company ("Cliffs"). (Compl. ¶¶ 54-59.) Subsequent to the
closing, Cliffs asserted a claim for breach of contract against
RG Steel, which proceeded to arbitration. (*Id.* ¶¶ 56-57.) The
arbitration panel found in favor of Cliffs and rendered an award
against RG Steel for $18,963,465.40 in damages, plus $1,524.53
in daily interest and $7,127.18 in arbitration fees. (*Id.* ¶¶
54-59.) Plaintiff contends that Defendants also failed to
disclose ten additional Material Contracts pursuant to which
Sparrows was obligated to sell tin plate to third parties at
prices below the cost of production. (Compl. ¶¶ 66-68.) RG
Steel has suffered more than $38 million in losses as a result
of these agreements. (*Id.* ¶ 69.)

Finally, Plaintiff maintains that Defendants failed to
disclose the existence of changes to their practices occasioned
by the Coke Supple Agreements and the 2010 Transportation

12

Contract.   (Compl. ¶ 70.)   Pursuant to Section 2.15 of the SPA,

Defendants represented and warranted that:

> Except as set forth in Schedule 2.15, since September
> 30, 2010 to the date of this Agreement: (i) the
> Business has been conducted in the ordinary course
> consistent with prior practices; . . . (x) neither the
> Company nor any of its Subsidiaries has amended,
> terminated, cancelled or compromised any material
> claims or waived any other rights of substantial
> value; . . . (xvi) neither the Company on [sic] any of
> its Subsidiaries has modified in any material respects
> its payment practices with any of its material
> suppliers.

(*Id.* ¶ 71.)   Defendants purportedly violated this provision by

failing to disclose that (1) Sparrows materially modified its

payment practices under the Coke Supply Agreements in the

January 31 Letter (*Id.* ¶¶ 42-53), and (2) pursuant to the 2010

Transportation Contract, Sparrows materially modified its

payment practices with Norfolk Southern.   (*See id.* ¶¶ 60-65.)

4. Covenants

   Article IV of the SPA is titled "Covenants and

Agreements."   Section 4.14 sets forth a number of covenants

regarding the termination of intercompany agreements, which are

pre-existing agreements between Severstal entities that would

remain with Severstal, on the one hand, and those that were sold

13

to RG Steel, on the other hand.   Section 4.14(d) obligates RG
Steel to cause its subsidiary Sparrows Point to repay to
Severstal's affiliates all outstanding intercompany trade
payables in an amount not to exceed $36 million "[o]n or prior
to the first anniversary of the Closing Date."   (*Id.* § 4.14(d).)

**The Applicable Standard**

          In considering a motion to dismiss pursuant to Rule
12(b)(6), the Court construes the complaint liberally, accepting
all factual allegations as true and drawing all reasonable
inferences in the plaintiff's favor.  *Mills v. Polar Molecular
Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993).   The issue "is not
whether a plaintiff will ultimately prevail but whether the
claimant is entitled to offer evidence to support the claims."
*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.
1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235–36, 94 S.
Ct. 1683, 40 L. Ed. 2d 90 (1974)).

          To survive dismissal, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)
(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.

Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege
sufficient facts to "nudge[ ] their claims across the line from
conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "The
plausibility standard is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully."  *Cohen v. Stevanovich*, 772 F.
Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept
the factual allegations of a complaint as true, it is "not bound
to accept as true a legal conclusion couched as a factual
allegation."  *Iqbal*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S.
at 555).


        "Under New York law . . . judgment as a matter of law
is appropriate if the contract is unambiguous.  Contract
language is unambiguous when it has a definite and precise
meaning, unattended by danger of misconception in purport of the
[contract] itself, and concerning which there is no reasonable
basis for a difference of opinion."  *Photopoint Techs., LLC v.
Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003) (internal
citations omitted); *see also Crane Co. v. Collec Indus., Inc.*,
171 F.3d 733, 737 (2d Cir. 1999) ("If the parties' intent is
unambiguously conveyed by the plain meaning of the agreements,
then interpretation is a matter of law.").  It is black letter
law that "[a] contract should be construed so as to give full

meaning and effect to all of its provisions," and "[r]ather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement." *Am. Express Bank v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (N.Y. Sup. Ct. 1990).

## I. **Defendants' Motion to Dismiss is Granted**

Severstal has moved to dismiss the First Cause of Action in part, and the Second and Fourth Causes of Action in their entirety, for failure to state a claim.

1. Because Plaintiff fails to Allege that the 2010 Transportation Contract Gives Rise to a Loss, Allegations as to That Contract in Plaintiff's First Cause of Action are Dismissed

Defendants move to dismiss the portion of RG Steel's First Cause of Action relating to the 2010 contract with Norfolk Southern, the 2010 Transportation Contract, which Plaintiff alleges Defendants failed to disclose resulting in a loss in the amount of $1,425,450.

Both parties agree that Defendants disclosed a transportation agreement between Severstal Warren and Norfolk Southern Railway dated February 9, 2007 (the "2007 Norfolk Southern Transportation Agreement"). (Compl. ¶ 60.) This

16

agreement has a 15 year term (through 2024) and required Severstal Warren to transport with Norfolk Southern no less than 215,000 tons of coke per year from a coke plant located in Haverhill, Ohio. (*Id.* ¶ 61.) Severstal Warren failed to ship a certain 215,000 tons under the 2007 Norfolk Southern Transportation Agreement, which gave rise to a $1,425,540 liability. (*Id.* ¶ 62.) Severstal Warren subsequently entered into the 2010 Norfolk Southern Agreement, which provides that Norfolk Southern will forgo collection of the $1,425,450, and Severstal Warren shall instead ship the missed 215,000 tons in 2024 (in addition to the original tonnage for 2024). (*Id.* ¶¶ 64-65.) According to RG Steel, Severstal's failure to disclose the subsequent 2010 Norfolk Southern Agreement, "that obligated Severstal Warren, LLC to pay the Accrued Liability," by increasing the required tonnage in a post-closing liability, rather than a pre-closing $1,425,450 Accrued Liability as assessed under 2007 Transportation Contract, was a material breach under § 2.16. (*Id.* ¶ 65.)

In § 2.16 of the SPA, Severstal represented and warranted that Schedule 2.16 contained an accurate list of all "Material Contracts," which include:

(e) any agreement, commitment or other Contract relating to Indebtedness of the Company or a Subsidiary thereof in an amount in excess of $1,000,000;

(i) any agreement, invoice, purchase order or other arrangement with any supplier or for the furnishing of services under the terms of which the Company or any of its Subsidiaries (i) is likely to pay or otherwise give consideration of more than $1,000,000 in the aggregate during the calendar year ending in December 31, 2011 or any calendar year thereafter or (ii) is likely to pay or otherwise give consideration of more than $5,000,000 in the aggregate over the remaining term of such agreement, in each case, that is not otherwise included under Section 2.16(d);

(j) any agreement, invoice, sales order or other arrangement for the sale of inventory or for the furnishing of services by the Business that (i) is likely to involve consideration of more than $1,000,000 in the aggregate during the calendar year ending in December 31, 2011 or any calendar year thereafter or (ii) is likely to pay or otherwise give consideration of more than $5,000,000 in the aggregate over the remaining term of such agreement, in each case, that is not otherwise included under Section 2.16(d).

(SPA §§ 2.16 (e), (i), and (j); Compl. ¶ 41.)  In Section 8.02, Severstal agreed to indemnify RG Steel for "Losses suffered, incurred, or sustained by [RG Steel] by reason of or resulting from (i) any inaccuracy or breach of a representation or warranty of [Severstal] . . . ." (SPA § 8.02.)

RG Steel has sufficiently alleged that the 2010 Transportation Contract was a "Material Contract," in that it was an "agreement . . . for the furnishing of services by the

18

Business" with consideration exceeding "$1,000,000." (*See* SPA § 2.16(j).)  However, the claimed $1,425,450 liability results from the 2007 Norfolk Southern Transportation Agreement, not from the 2010 Contract.  The 2010 Transportation Agreement does not give rise to the loss, but provides that Norfolk Southern "shall forgo collection" of the pre-existing $1,425,450 obligation provided that Severstal Warren will ship the 215,000 tons at issue in 2024.  (*Id.* ¶ 64.)  That the obligation was altered from a pre-closing liability to a post-closing liability does not change the fact that the underlying liability is not the result of "any inaccuracy or breach of a representation or warranty of [Severstal]," (*see* SPA § 8.02), but rather was disclosed by Defendants in the 2007 Transportation Contract.  RG Steel therefore fails to plead a loss related to the 2010 Norfolk Southern Transportation Agreement, and Plaintiff's allegations as to that contract are dismissed.


2. <u>Plaintiff has Sufficiently Alleged a Change in Payment</u>
   <u>Practices with Respect to the Coke Supply Agreements and</u>
   <u>the 2010 Norfolk Southern Transportation Contract</u>

Plaintiff's Second Cause of Action alleges that the Coke Supply Agreements and the 2010 Norfolk Southern Transportation Contract, which Defendants failed to disclose,

constituted changes in payment practices in breach of the representation and warranty in § 2.15 of the SPA. (SPA § 2.15.)

Pursuant to Section 2.15 of the SPA, Severstal represented and warranted to RG Steel that between September 30, 2010, and March 1, 2011, there was an absence of certain changes in its business, specifically that,

> (i) "the Business has been conducted in the ordinary course consistent with prior practice" and (xvi) "neither the Company or any of its Subsidiaries has modified in any material respects its payment practices with any of its material suppliers."

(SPA § 2.15(a) (i) and (xvi).) Plaintiff contends that on January 31, 2011, Defendants received a letter modifying the payment provisions of the Coke Supply Agreements, (Compl. ¶ 50) and that "in or about December 1 2010," Severstal entered into the 2010 Transportation Contract, which transformed a pre-closing Accrued Liability into a post-closing obligation to transport an additional 215,000 tons of coke with Norfolk Southern. (*Id.* ¶¶ 63-64.) The Complaint alleges that both of these agreements materially changed Defendants' payment practices in breach of § 2.15.

20

The Coke Supply Agreements are grounded in a Service Provision Agreement, which provides that,

> Upon delivery of the Sparrows Point Coke to the Delivery Point (as defined in the Coke Supply Agreements) relating to the Sparrows Point facility, (i) Recipient [Severstal Sparrows Point LLC] shall notify Provider [ArcelorMittal] in writing of the occurrence of such delivery, [and] (ii) Recipient shall pay Provider in all cash amounts owed by Provider for the Sparrows Point Coke pursuant to the applicable Coke Supply Agreement. . . .

(Compl. ¶ 49.)  Although Defendants disclosed the existence of the Coke Supply Agreements, Defendants did not disclose a January 31, 2011 letter from ArcelorMittal to Severstal N.A., in which the favorable fixed price provision had been removed and the price to be paid by Severstal Sparrows Point LLC had been increased, equating to an aggregate price increase of $80.7 million over the term of the contracts.  (Compl. ¶¶ 50-51.)

Defendants do not seem to dispute that the underlying Agreements involves material suppliers, or that a price change occurred, but rather contend that this is merely the failure to disclose a "Material Contract" in violation of § 2.16, not a violation of § 2.15.  Defendants maintains that § 4.01 of the SPA, which sets forth Severstal's covenants during the time between the execution of the SPA and closing, demonstrates that

21

§ 2.15 does not provide for mere failures to disclose Material
Contracts.   Section 4.10 contains a covenant that the Company
shall "not enter into, materially amend or terminate any
Material Contract, or waive any material right thereunder."
(SPA § 4.10(k).)  According to Defendants, if the language in
Sections 4.10(a) and (r), which is identical to the language in
Sections 2.15 (i) and (xvi), included representations and
warranties related to the disclosure of Material Contracts, then
it would have been unnecessary to include provision (k) in
Section 4.10, showing that Section 2.15 (i) and (xvi) did not
include representations and warranties related to disclosure of
Material Contracts.   (Defendants Memorandum in Support of Motion
to Dismiss, "Def. Mem."; at 20 (citing *Muzak Corp. v. Hotel Taft
Corp.*, 1 N.Y.2d 42, 46-47 (1956) ("The rules of contruction of
contracts require us to adopt an interpretation which gives
meaning to every provision of a contract or, in the negative, no
provision of a contract should be left without force and
effect.")).)

          The representations and warranties covenants are not
superfluous: § 2.15(a) covers the period from September 30, 2010
to the date of the execution of the SPA, and the covenants cover
the period between the execution of the SPA and closing.   (SPA §
4.01.)  Further, the January 31 Letter altered in a "material

respect" the payment practices of the Coke Supply Agreement,
which dealt with some of Defendants "material suppliers." (SPA
§ 2.15.) Regardless of Defendants' contractual interpretation,
the letter is not advanced for purposes of § 2.15 as a "Material
Contract," and in all aspects fits the plain language
interpretation of § 2.15. Whether the letter can also serve as
a "Material Contract" in violation of § 2.16 need not be
determined. Because the January 31 Letter materially alters
payment practices relating to material suppliers, RG Steel has
sufficiently alleged a violation of § 2.15 with respect to the
Coke Supply Agreements.

As to the 2010 Transportation Contract, Defendants
contend that even if § 2.15 is applicable to the failure to
disclose Material Contracts, RG Steel's claim still fails as to
the Norfolk Southern agreement because no changes in payment
practices are alleged to have occurred between September 30,
2010 and March 1, 2011 as required under § 2.15. The Complaint,
though, alleges that the change in payment practices forming the
basis for the claim under the 2010 Transportation Contract (the
assumption of an obligation to transport an additional 215,000
tons of coke with Norfolk Southern instead of pre-closing
liability) occurred when that agreement was entered into in or
about December 1, 2010, within the relevant period of September

23

30, 2010 to March 1, 2011.  (Compl. ¶¶ 63-64.)  There is no
aspect of § 2.15 that suggests that it is the date of when the
potential change is ultimately instituted, and not a change
occurring or made during the specified period, that governs.  As
such, at this stage, RG Steel has sufficiently alleged that the
2010 Transportation Contract constitutes a change in payment
practices or in the ordinary course of business occurring in the
relevant period.

Defendants' motion to dismiss Plaintiff's Second Cause
of Action as to both the Coke Supply Agreements and the 2010
Transportation Contract is therefore denied.

3. Plaintiff Fails to Sufficiently Allege A Basis to Postpone
   its Obligations under the $100 Million Note or the $36
   Million Repayment

Plaintiff's Fourth Cause of Action requests a
declaration that it is excused from its obligations to pay the
Note and the $36 million repayment pursuant to Section § 4.14(d)
of the SPA until the purchase price adjustment arbitration is
complete and RG Steel is indemnified in this action for the
losses it has suffered as a result of Defendants' breach of the
SPA.[1]

---

[1] To preserve its right to seek setoff, RG Steel also mentions that it seeks
to delay its obligations because Severstal has materially breached the SPA.

Section 4.14(d) of the SPA requires Plaintiff to repay
$36 million in existing intercompany trade payables on May 31,
2012, the first anniversary of the Closing.  (Compl. ¶ 73; SPA §
4.14(d).)  Article IX of the SPA provides that Note "shall mean
a note in the principal amount of $100 million, issued by RG
Steel to Severstal.  The Note with a principal amount of $100
million was executed on March 31, 2011, and provides for
quarterly interest payments beginning on June 30, 2012, until
the entire principal amount is repaid in full by March 31, 2016.
(Exhibit 1, Preamble, § 1.1.)

### A.  *The SPA does not Condition the $36 Million Repayment on the Indemnification Claims*

Plaintiff maintains that its entitlement to a
declaration does not depend on an express provision permitting
withholding of payments otherwise due on the SPA.  Rather, RG
Steel's Fourth Cause of Action serves to preserve Plaintiff's
right to seek setoff claims, to the extent they are asserted
other than as counterclaims in this action.  Plaintiff's Fifth

---

The Complaint does not plead facts supporting such a material breach,
explaining what the material breach allegedly consists of, or naming relevant
factors to support its theory.  Instead, Plaintiff merely states that it is
entitled to a declaration "[b]ased upon Severstal's material breaches of the
SPA." (Compl. ¶ 82.)  This is insufficient to support Plaintiff's claim.
*Riviera Fin. Of Tex. v. CapGemini US, LLC*, 511 F. App'x 92, 95 (2d Cir. 2013)
(a material breach must be "so substantial as to defeat the purpose of the
entire transaction.").

Cause of Action, which Defendants do not dispute, seeks setoff "for the amounts owed [] by Severstal in connection with the post-closing purchase price adjustment and indemnity claims." (Compl. ¶¶ 115-120.) According to RG Steel, the Fourth Cause of Action is pled to ensure that Plaintiff (1) independent of RG Steel's breach of contract claims, preserves its right pursuant to the SPA to not pay the $36 million obligation before the purchase price adjustment process is complete and the indemnification claims are resolved; and, more generally, (2) to preserve RG Steel's setoff rights in the event Defendants assert claims against Plaintiff for amounts owed under the SPA in a different action.[2]

Even if an explicit SPA provision were required to justify the Fourth Cause of Action, Plaintiff further maintains that the SPA permits the netting of such payment obligations.

In determining the final purchase price adjustment, the arbitrator analyzes two variables: the working capital and indebtedness of Sparrows. (SPA § 1.04(b)(ii).) Section 1.04(b)(vi) provides that "any payment required to be made by a party" because of the adjustment "may be made net of the amount

---

[2] Plaintiff maintains that this cause of action will be unnecessary in the event Defendants' answer includes counterclaims for the $36 million payment and the Note, and the purchase price adjustment process concludes prior to judgment in this case.

of any lesser payment required to be paid to such party pursuant to" the purchase price adjustment process.   This allows payments to be netted against one another if both working capital and indebtedness exceed expectations.   Plaintiff alleges that it is therefore reasonable that the SPA intended, and should be interpreted to provide, a commercially reasonable result with respect to other payment obligations, including the $36 million repayment and any recovery Plaintiff is entitled to based on its indemnification claims.   *See Interdigital Comm'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 530 (S.D.N.Y 2005) (quoting *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (1st Dep't 2003) (collecting cases) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonably expectation of the parties.").

As an initial matter, Plaintiff does not advocate for a "commercially reasonable" result.   Plaintiff's version of "netting" in this case is of indefinite delay: the netting would not occur unless and until RG Steel prevails on the disputed indemnification claims in this litigation.   The deadline for the $36 million repayment occurs on the first anniversary of the Closing.   The indemnification claims likely could not be concluded before this deadline because, depending on the type of claim at issue, the representations and warranties that form the

27

basis for indemnification expire either 18 months after the closing, five years after the closing, or 30 days after the applicable statute of limitations expires, or never. (SPA § 8.01.) If a Claim Notice or Indemnity Notice was timely provided, a representation or warranty does not expire until the related indemnification claim is resolved, and the SPA provides no deadline for resolution of an indemnification claim. It is unreasonable to suggest that the parties intended to condition the repayment upon claims that did not even have to brought, let alone resolved, until years after the repayment of the $36 million is required. (SPA § 4.14(d).) This would create a right of setoff where none yet exists, and may never exist. It is well settled that there is no right to setoff a possible, disputed liability against an undisputed claim that is due and payable. *See, e.g.*, *Willett v. Lincolnshire Mgmt., Inc.*, 756 N.Y.S.2d 9, 10 (1st Dep't 2003); *Spodek v. Park Prop. Dev. Assoc.*, 693 N.Y.S.2d 199, 199 (2d Dep't 1999) ("The obligation purportedly owing from plaintiff to defendant is currently being disputed and there is no right to setoff a possible, unliquidated liability against a liquidated claim that is due and payable."); *Banco Popular North America v. Lieberman*, 75 A.D.3d 460, 461 (1st Dep't 2010) ("Defendants' claim to a setoff based upon alleged improper [] practices by plaintiff is merely

a possible, unliquidated liability, and does not preclude plaintiff's immediate recovery [from defendant].").

In addition, the SPA provisions demonstrate that the parties did not contract for or intend such a correlation between the provisions.  The existence of SPA § 1.04(b)(vi) highlights that the parties expressly provided for those circumstances in which one obligation under the SPA should be netted against another, and did not include that the repayment obligation can or should be dependent upon the indemnification claims.  *See, e.g.*, *In re New York City Asbestos Litigation*, 838 N.Y.S.2d 76, 80 (1st Dep't 2007) (canon of contract interpretation, *expression unius est exclusion alterius*, the expression of one thing implies the exclusion of the other); *VKK Corp. v. National Football League*, 244 F.3d 114, 130-31 (2d Cir. 2001) (same).

To the contrary, the $36 million repayment relates to the satisfaction of a pre-existing legal obligation between two of Severstal's subsidiaries, and is set forth in Article IV, titled Covenants and Agreements as one of many conditions related to intercompany agreements.  Indemnification is detailed independently in Article VIII.  In no place in Section 1.04(b)(ii), or elsewhere in the SPA, does any provision provide

29

a correlation between the two sections, make the unambiguous $36 million repayment obligation (*see* SPA § 4.14(d)) dependent on the resolution of indemnification claims, or allow a postponement of that payment obligation based upon other potential liabilities.  Further, Section 8.06 provides that the indemnification process set forth in Article III shall be the exclusive remedy of the parties "for any inaccuracy in any representation or warranty, misrepresentation, breach of warranty or nonfulfillment or failure to be performed of any covenant or agreement" contained in the SPA.  (SPA § 8.06.) This excludes remedies for claims for indemnification alternative to those detailed in Article VIII, and does not allow a party seeking indemnification to suspend its performance of other independent obligations pending resolution of its indemnification claims.

As such, Plaintiff cannot postpone its repayment obligation pending the resolution of its indemnification claims.

> B. *The SPA does not Contemplate that the Post-Closing Purchase Price Adjustment was to be Resolved Prior to Plaintiff's $36 Million Repayment Obligation under the SPA*

30

In the event that RG Steel is not entitled to postponement based on the pending indemnification claims, Plaintiff contends it would still be entitled to a declaration staying its obligation to pay the $36 million, because this repayment is conditioned on the completion of the final purchase price adjustment process.

RG Steel alleges that the SPA called for a time-constrained adjustment process: SUSH II was to prepare and deliver to RG Steel a Closing Statement containing Sparrows' actual working capital and outstanding indebtedness "[a]s soon as practicable after the Closing Date, but not later than sixty (60) days." (SPA § 1.04(b)(i).) RG Steel then had 30 days to review and provide SUSH II with any Protest Notices. (*Id.* § 1.04(b)(iii).) Failure to deliver a Notice within that time period "constitue[d] [RG Steel's] acceptance of the Closing Statement as prepared by [SUSH II.]" (*Id.*) Alternatively, upon receipt of a Notice, SUSH II had 30 days to object or was "deemed to have accepted" RG Steel's adjustments. (*Id.* § 1.04(b)(iii).) If SUSH II timely objected, the parties were given 10 business days "to resolve the dispute[,]" or, if no resolution was forthcoming, to refer any dispute to either an accounting firm or "within five (5) days of notice" of a party's intent to initiate a referral. (*Id.*) The SPA then granted the

31

parties 10 days to submit to the chosen accounting firm "a
written statement summarizing" their positions "together with
such supporting documentation" as deemed necessary.  (*Id.*)  The
accounting firm should "render its decision within thirty (3)
days of its appointment or as soon thereafter as is reasonably
practicable."  (*Id.*) Lastly, the decision of the arbitrator
"shall be final and binding," and "shall not be subject to
appeal" by either party.  (*Id.*)  According to Plaintiff, this
time table demonstrates that the SPA intended to condition the
$36 million on completion of the final purchase price adjustment
process.

        The SPA does not, however, provide for a date certain
by which the purchase price adjustment process is required to be
completed, or that it be completed "within 6 months of Closing,"
as Plaintiff suggests. (Compl. ¶ 19) The (1) parties did not
have a finite deadline by which to refer the matter to
arbitration (*id.* § 1.04(b)(iii)[3]; (2) the parties did not have a
finite deadline by which to provide the arbitrator with an
"engagement letter" (*id.*); and (3) the arbitrator could render

---

[3] Although the SPA states that the parties must wait until ten days after
Severstal's notification to RG Steel of objections to the Protest Notice to
refer matters to arbitration, it does not require either party to do so at
any specific time.  RG Steel waited until 60 days after Severstal issued its
objections to the Protest Notice to refer this matter to the independent
accounting firm.  *Several US Holdings LLC v. RG Steel, LLC*, Case No. 11-cv-
6922 (RWS), 865 F. Supp. 2d 430 (S.D.N.Y 2012).

her decision within thirty days or "as soon thereafter as is reasonably practicable" (id.). (Def. Mem. at 12-13.) There is no requirement that the post-closing purchase price adjustment be concluded prior to the first anniversary of the Closing, or for Plaintiff's suggestion that the SPA structured a "timetable" intending to allow RG Steel to setoff against its $36 million payment due on the first anniversary of the Closing any amounts owed by Severstal to RG Steel as a result of the purchase price adjustment.[4] (Compl. ¶ 19.) Plainitff's cited time tables thus do not suggest, let alone require, that the $36 million repayment be postponed until the completion of the post-closing purchase price adjustment.

Nor does any other provision in the SPA condition the $36 million repayment obligation on the completion of the post-closing purchase price adjustment. The SPA does not include the $36 million repayment in the purchase price or in any way designate it as a component of the purchase price or related to the post-closing purchase price adjustment. (SPA §§ 1.01;

---

[4] Nothing in the SPA suggests that the parties contemplated that RG Steel would be owed money under the post-closing purchase price adjustment, or that the timetables RG Steel cites were intended to allow RG Steel to setoff against the $36 million repayment obligation. Further, according to RG Steel's theory, if Severstal owed RG Steel any money when the post-closing purchase price adjustment concluded after "six months," Severstal would have had to have paid RG Steel, and then wait another six months for RG Steel (or its subsidiary) to pay the $36 million to Severstal. (Plaintiff Opposition Memorandum, "Pl. Opp."; at 18-19.) Such an obligation would have been explicitly detailed in the contracts had it been intended.

33

1.04.)  As with Plaintiff's allegations regarding the
indemnification claims, the parties could have provided for a
mechanism to credit the amounts that Severstal owed under the
post-closing purchase price adjustment against the $36 million
repayment, and did not do so.  The fact that the deadline to
make the $36 million repayment was after the tenuous deadline to
complete the purchase price adjustment process does not create
an obligation between two independent provisions for which the
parties did not contract.  It is well established that "courts
may not rewrite a term of a contract by 'interpretation' when it
is clear and unambiguous on its face."  *Fiore v. Fiore*, 46
N.Y.2d 971, 973 (1979); *see also Am. Express Bank*, 164 A.D.2d at
277.  The sophisticated parties at issue undoubtedly knew how to
contract for the payments to be conditioned as such, and
declined to do so.  This deliberate choice must be given effect.
*Chimart Assocs. v. Paul,* 66 N.Y.2d 570, 574-75(1986) (holding
that the decisions by "sophisticated, counseled parties dealing
at arm's length" in a "multimillion dollar transaction" to not
contract for such rights must be given effect).

> C. *Neither the SPA nor the Note Condition Payment upon*
> *Resolution of the Post-Closing Purchase Price*
> *Adjustment Process or Resolution of Indemnification*
> *Claims*

34

In addition to postponement on the repayment, Plaintiff alleges that "RG Steel is entitled to a declaration that it is excused from its obligations to pay the Note . . . until the purchase price adjustment process is complete and RG Steel is indemnified for the losses it has suffered as a result of Severstal's breach of the SPA."[5]

Neither the SPA nor the Note itself sets forth any condition relating the Note to either the post-closing purchase price adjustment or the indemnification claims. Instead, the SPA specifically excludes the Note from the post-closing purchase price adjustment: Section 1.01 of the SPA provides that the "aggregate consideration to be paid by [RG Steel] at the Closing . . . shall be (i) the Note, plus (ii) cash in the amount equal to the Initial Purchase Price (as adjusted pursuant to Section 1.04, the 'Final Purchase Price')." Section 1.04(a) defines the Initial Purchase Price as $125 million, subject to an initial adjustment at Closing and a final adjustment through the post-closing purchase price adjustment, which yields the Final Purchase Price. Because Section 1.01 provides that only the Initial Purchase Price is adjusted pursuant to Section 1.04

---

[5] The "Final Purchase Price" subsection of Plaintiff's "Factual Allegations" does not mention any claim related to the Note (Compl. ¶ 82), and does not include any allegations about a relationship between the Note and either the post-closing purchase price adjustment and/or the indemnification provisions of the SPA that would require conditioning payment of the Note upon resolution of either. The Plaintiff's opposition brief also does not offer any arguments to support such a requirement or allowance.

through the post-closing purchase price adjustment (SPA § 1.04), the principal amount of the Note was to remain at $100 million regardless of the fluctuations in the Initial Purchase Price and Final Purchase Price. For example, under the provisions of the SPA, if the initial adjustment to the Initial Purchase Price lowered the purchase price by over $125 million, Severstal would have had to pay cash at the Closing to RG Steel in that amount less $125 million. (*Id.* §§ 1.01(a) and (b)(iv).)

The SPA therefore does not allow RG Steel to postpone its present obligations under the Note based on the purchase price adjustment. Severstal cannot postpone its present obligations by reducing the principal amount of the Note due years later. Nor do the provisions governing the indemnification claims relate to the interest or principal payments of the Note. The deadlines in Article VIII show that, to the contrary, the indemnification claims need not be brought or resolved by June 30, 2012, the time that the interest payments on the Note begin, or March 31, 2016, the date the principal payment on the Note is due. (Exhibit 1 Preamble, § 1.1.) RG Steel has thus failed to show that the Note is conditioned upon either the purchase price adjustment or resolution of the indemnification claims.

36

Because Plaintiff has not pled any basis for a declaration to postpone its obligations under the $100 million Note and the $36 million repayment until the post-closing purchase price adjustment process is concluded and the indemnification claims are resolved, the Fourth Cause of Action is dismissed in its entirety. *See, e.g.*, *Pfizer, Inc. v. Stryker Corp.*, 348 F. Supp. 2d 131 (S.D.N.Y. 2004) (failure to indemnify was only excused if the contract made the indemnification obligation dependent upon plaintiff's performance under other sections of the agreement).

## II.  Plaintiff's Motion to Replead is Denied

In the event RG Steel's allegations are found insufficient, Plaintiff requests leave to amend its dismissed claims.

Absent undue delay, bad faith, undue prejudice, or futility, the "mandate" under Rule 15(a)(2) to freely grant leave to amend "is to be heeded." Foman v. Davis, 371 U.S. 178, 182 (1962); see also AEP Energy Servs. Gas Holding Co. v. Bank of Am. N.A., 626 F.3d 699, 725 (2d Cir. 2010) ("'The rule in this Circuit has been to allow a party to amend its pleadings in

37

the absence of a showing by the nonmovant of prejudice or bad faith.'") (quoting Block v. First Blood Assocs., 988 F.2d 344, 350 (2d Cir.1993)).

This case has been pending since April 2012 and discovery has yet to begin.  A second amended complaint would cause no material delay in the resolution of this case. However, amendment would be futile.  Plaintiff's claims fail on the plain language of the SPA, which is unambiguous and conclusive.  Plaintiff has not cited any additional facts it would plead to overcome these provisions of the SPA, but rather states that "any amendment would simply offer clarity on the issues discussed in this motion."  (Pl. Opp. at 19-20.)  As such, Plaintiff's request for leave to amend the dismissed claims is denied.

**Conclusion**

Based upon the conclusions set forth above, Defendant's Motion to Dismiss is granted in part and denied in part: Plaintiff's First Cause of Action with respect to the 2010 Transportation Contract, and Fourth Cause of Action in its entirety, are dismissed.

38

It is so ordered.

**New York, NY**
**January 14, 2014**

_____

**ROBERT W. SWEET**
**U.S.D.J.**