UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

RG STEEL, LLC,

                   Plaintiff,                13 Civ. 1540

    -against-

                                        <u>AMENDED OPINION</u>

SEVERSTAL US HOLDINGS, LLC and SEVERSTAL
US HOLDINGS II, LLC,

                   Defendants.

------------------------------------------X

A P P E A R A N C E S :

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-24-14

<u>Attorneys for the Defendants Severstal US Holdings,
LLC and Severstal US Holdings II, Inc.</u>

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
By:  Scott D. Musoff, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker
Chicago, IL 60606
By:  Albert L. Hogan, III, Esq.
      Amy L. Van Gelder, Esq.
      Andrew J. Fuchs, Esq.

<u>Attorneys for Plaintiff RG Steel</u>

WILKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
By:  Brian E. O'Connor, Esq.
      Benjamin P. McCallen, Esq.
      Joshua M. Troy, Esq.

**Sweet, D.J.**

Defendants Severstal US Holdings, LLC ("SUSH") and Severstal US Holdings II, Inc. ("SUSH II") (collectively "Severstal" or "Defendants") move pursuant to Rule 12(b)(6) to partially dismiss the Complaint of Plaintiff RG Steel ("RG Steel" or "Plaintiff").

For the reasons set forth below, Defendants' motion is granted.

**Procedural History**

On October 3, 2011, Severstal filed a complaint seeking a declaratory judgment to bar the arbitration sought by RG Steel and to limit its relief to indemnification. On November 7, 2011, RG Steel sought an order to compel arbitration, appoint an arbitrator and stay this action. On May 23, 2012, RG Steel's motion was granted.

Plaintiff brought the instant action on March 30, 2012. After Defendants disputed the allegations on subject matter jurisdiction, Plaintiff voluntarily dismissed the action on April 20, 2012.

1

Plaintiff refiled the action the same day in the Supreme Court of the State of New York.  Prior to Defendants filing their answer, Plaintiff and affiliated entities filed for protection under Chapter 11 of the Bankruptcy Code, and the State Court stayed the action.  By Notice of Removal dated March 7, 2013, RG Steel removed the action to this court.

Plaintiff filed the Amended Complaint ("Complaint") on June 7, 2013.  The Complaint alleges five independent causes of action and seeks to recover for losses and/or damages sustained in connection with RG Steel's purchase of certain steel mills from Defendants pursuant to the Stock Purchase Agreement (the "SPA") entered into in 2011, as well as certain declaratory relief.

On July 22, 2013, Defendants filed the motion to dismiss.  On September 30, 2013, the parties stipulated and agreed that Plaintiff's Fourth Cause of Action was voluntarily withdrawn without prejudice.  Defendants' motion to dismiss was heard and marked fully submitted on October 2, 2013.

**Facts**

1. The Parties and the SPA

RG Steel is a Delaware limited liability company that manufactures a variety of steel mill products, including hot-rolled, cold-rolled, and coated sheets, and tin mill products. SUSH is a Delaware limited liability company.  It is the sole owner of the issued and outstanding equity interests of SUSH II, a Delaware corporation and former owner of the equity interests of Severstal Sparrows Point, LLC ("Severstal Sparrows Point"). SUSH and SUSH II are subsidiaries of Severstal International, a global steelmaker which has operations in Russia, the United States and elsewhere.

RG Steel, SUSH, SUSH II and Severstal Sparrows Point entered into the March 1, 2011 SPA, which provided that RG Steel would purchase the equity in three U.S.-based steel companies from SUSH. The facilities are located in Sparrows Point, Maryland, Warren, Ohio and Wheeling, West Virginia and were acquired by Severstal between May 2008 and August 2008. In connection with the transaction, RG Steel purchased all of the equity of Severstal Sparrows Point, which in turn owned all of the outstanding equity in Severstal Warren LLC ("Warren" or

3

"Severstal Warren") and Severstal Wheeling Inc. ("Wheeling").
(Compl. ¶ 7; SPA §§ 1.01, 1.04.)  In exchange, RG Steel agreed
to the following payment schedule: (1) $125 million in cash,
subject to a purchase price adjustment based on the amount of
working capital at the company at closing (*Id.* ¶ 8.); (2) $100
million in the form of a note (the "Note"), the principal of
which was due five years after closing (*id.*); (3) repayment of
$317 million of third-party bank debt owed by the Severstal
entities (*id.*) and (4) $36 million in cash to be paid to two
Severstal subsidiaries within one year of closing.  (*Id.*)  The
transaction closed on March 31, 2011.  (Compl. ¶ 37.)


1. The Purchase Price


        Section 1.01 of the SPA provides that the "aggregate
consideration to be paid by [RG Steel] at the Closing . . .
shall be (i) the Note, plus (ii) cash in the amount equal to the
Initial purchase Price (as adjusted pursuant to Section 1.04,
the Final Purchase Price)."


        The Note has a principal amount of $100 million, with
a maturity date of March 21, 2016, and quarterly interest
payments due beginning on June 30, 2012, until the entire

                                4

principal amount is repaid in full.  (Exhibit 1, § 1.1.)  The
Note also sets forth certain mandatory prepayment events that
require immediate payment of the Note in full, including, for
example, a change of control or certain sales, transfers, and
dispositions of RG Steel's interest in the acquired businesses.
(Exhibit 1 Preamble, § 1.5.)  In addition, upon the occurrence
of an event of default, including RG Steel's bankruptcy,
Severstal may declare all or a portion of the Note immediately
due and payable.  (*Id.* §§ 2.1, 2.3.)

        Section 1.04(a) of the SPA defines the Initial
Purchase Price as $125 million, subject to an upward or downward
adjustment based on the acquired business's net work capital and
certain indebtedness as of the Closing Date, also known as the
"Effective Time," as compared with baseline amounts set forth in
the SPA.  (SPA § 1.04.)  The SPA provides for two phases of this
adjustment.  First, pursuant to a calculation two business days
before the Closing, the Initial Purchase Price was subject to an
initial upward or downward adjustment based on Severstal's
estimate of the net working capital and certain indebtedness as
of the Closing Date, as compared with baseline amounts set forth
in the SPA.  (*Id.*)  The estimates of net working capital and
indebtedness resulted in RG Steel paying only $85 million at the

5

Closing.  *Several US Holdings LLC v. RG Steel, LLC*, Case No. 11-cv-6922 (RWS), 865 F. Supp. 2d 430 (S.D.N.Y. 2012).

Second, the SPA provides for another, final adjustment to the purchase price based on the difference between final calculations of net working capital and certain indebtedness, and Severstal's estimate of net working capital and certain indebtedness of Severstal Sparrows Point and its subsidiaries, as of the Closing Date.  (SPA § 1.04(b).) The second adjustment is conducted through a multi-step exchange of calculations between the parties and yields the Final Purchase Price.  (*Id.*)

2. The Arbitration Process

In the event that the parties were unable to agree on the amount of this final adjustment, Article I of the SPA provides for either party to refer their disputes to an independent accounting firm. (*Id.* §§ 1.04(b)(iii) and (iv).) The parties would then use the independent accounting firm's resolution of their disputes to calculate the Final Purchase Price.  (*Id.* §§ 1.04(a)(i), (b)(iii), and (b)(iv).)

In this case, at the conclusion of the parties' exchange of calculations, RG Steel proposed adjustments to the

6

final purchase price that could, if accepted, essentially reduce the cash purchase price to zero.  Severstal disputed the validity of nearly all of these purported adjustments.  Under Severstal's calculation of the purchase price adjustment, RG Steel would owe it $29 million.  *See Severstsal US Holdings LLC v. RG Steel, LLC*, 865 F. Supp. 2d 430 (S.D.N.Y. 2012).  On September 3, 2011, RG Steel notified Severstal that it was referring the parties' disputes to arbitration pursuant to Section 1.04(b)(iii) of the SPA. *Id.* at 431.

The parties selected an individual within the independent accounting firm to serve as arbitrator and negotiated and executed an engagement letter.  On December 27, 2011, the independent accounting firm issued a schedule for the arbitration, including a staggered exchange of submissions and a decision date of May 11, 2012.  (Exhibit 2.)  On March 8, 2012, prior to rendering a final decision, the independent accounting firm resigned as arbitrator due to a conflict of interest involving RG Steel.  (Compl. ¶ 81.)

On May 31, 2012, RG Steel filed a voluntary petition for relief under Chapter 11 of the United States Code in the United States District Court for the District of Delaware. (Compl. ¶ 1.)  Pursuant to the bankruptcy stay, the arbitration

was suspended for approximately one year until the parties
worked to locate and engage a new arbitrator.  The parties have
agreed upon a schedule that concludes the arbitration in 2013.
(Compl. ¶ 81.)


3. Representations and Warranties


        In negotiating the SPA, the parties bargained for and
obtained certain representations and warranties.  (*Id.* ¶ 8.)  In
particular, the preamble to Article II of the SPA provides that,
"[e]xcept as otherwise set forth in a schedule to any particular
representation and warranty (collectively, the "Disclosure
Schedules"), the Company and Parents represent and warrant to
Purchaser that all of the statements contained in this Article
II are true as of the date of this Agreement. . . ." (*Id.* ¶ 30.)


        Section 8.02 of the SPA provides that Defendants must
indemnify and hold harmless RG Steel for any breach of
representation or warranty made by Severstal in Article II or
failure to perform or fulfill any covenant contained in the SPA:


                Subject to the provisions of this Article II, from and
                after the Closing, Parents shall, jointly and
                severally, indemnify Purchaser and its Affiliates . .
                . in respect of, and hold them harmless from and
                against, any and all Losses suffered, incurred or

                                    8

> sustained . . . by reason of or resulting from (i) any
> inaccuracy or breach of a representation or warranty
> of Parents and the Company contained in Article II of
> this Agreement or (ii) any nonfulfillment of or
> failure to perform any covenant or agreement on the
> part of any of the Parents or, with respect to
> covenants or agreements to be performed prior to the
> Closing, the Company, contained in this Agreement.

(Compl. ¶ 32; SPA § 8.02.) "Loss" is defined as "any and all damages, Liabilities, costs and expenses (including reasonable attorneys' fees)." (Compl. ¶¶ 32-33; SPA § 9.01(a).)

Depending on the specific section, the representations and warranties that form the basis for indemnification claims expire either 18 months after the Closing, five years after the Closing, 30 days after the applicable statute of limitations expires, or never. (*Id.* § 8.01.) If a Claim Notice or Indemnity Notice was timely provided, a representation or warranty does not expire until the related indemnification claim is resolved. (*Id.*)

Sections 8.02(c)-(h) and 8.03-8.07 set forth additional detailed provisions applicable to the parties' indemnification obligations and detailed procedures for making an indemnification claim. As part of those procedures, Section 8.03 sets forth the process for delivering a Claim Notice to the indemnifying party and the process for the indemnifying party to

9

assume control of the defense of a third-party action.  Section

8.06 provides that an indemnification claim set forth in Article

VII shall be the exclusive remedy of the parties "for any

inaccuracy in any representation or warranty, misrepresentation,

breach of warranty or nonfulfillment or failure to be performed

of any covenant or agreement contained" in the SPA.  (*Id.* §

8.06.)

In Section 2.16, Severstal represented and warranted

that Schedule 2.16 contained an accurate list of all "Material

Contracts" to which Sparrows or an affiliate was a party.  (SPA

§ 2.16(a)-(n).)  A Material Contract is one that "involves the

payment or receipt of an amount in excess of $1,000,000."  (*Id.*)

Plaintiff contends that Defendants represented to RG

Steel that it was assuming the benefits of ten-year coke supply

agreements that provided the steel ingredient coke at relatively

fixed conversion prices for the life of the agreements, (*see*

Compl. ¶¶ 44-46), but that RG Steel did not receive the

contractual benefits for which it paid. (*Id.* ¶ 53.) The

agreements include: the Haverhill Agreement, the Jewell

Agreement, and the Service Provision Agreement (collectively,

the "Coke Supply Agreements").  Defendants, purportedly in

violation of these warranties, failed to disclose a letter dated

10

January 31, 2011 (the "January 31 Letter"), from ArcelorMittal
Cleveland Inc. ("ArcelorMittal"), through whom Sparrows
purchased coke, in which ArcelorMittal stated that the favorable
fixed-price provision had been removed and the price to be paid
by Sparrows was substantially higher.  (*Id.* ¶ 50.)
ArcelorMittal raised the price from $22.00 fixed/$20.90 variable
and $10.10fixed/$22.00 variable under the Haverhill and Jewell
Agreements, respectively, to $37.50 fixed/$37.50 variable under
both.  (*Id.* ¶ 51.)  Plaintiff alleges that this caused RG Steel
to incur an unexpected liability of $80.7 million. (*Id.*)

        Plaintiff also asserts that Defendants failed to
disclose the existence of a transportation contract pursuant to
which Sparrows was burdened with an additional future obligation
of $1,425,450.00.  (Compl. ¶ 65.) Specifically, Defendants
provided Plaintiff with a 2007 contract in which a Sparrows
subsidiary, WCI Steel, Inc. (the predecessor-in-interest to
Severstal Warren), agreed to transport no less than 215,000 tons
of coke per year for 15 years with Norfolk Southern Railway
Company ("Norfolk Southern") and its subsidiary railroads (the
"2007 Transportation Contract").  (*Id.* ¶¶ 60-61.)  Defendants
purportedly did not disclose that the 2007 Transportation
Contract was terminated in light of Severstal Warren's breach
and replaced with a contract executed December 1, 2010 ("the

11

"2010 Transportation Contract"). (*Id.* ¶¶ 62-63.) The 2010 Transportation Contract specified that "no tonnage was shipped under [the 2007 Transportation Contract] in 2009, resulting in a 215,000 ton deficit and an obligation to pay [Norfolk Southern] $1,425,450" (the "Accrued Liability"), and further provided that Norfolk Southern "shall forgo collection of the Accrued Liability and 215,000 tons is hereby added to the Prior Minimum Volume for 2024." (*Id.* ¶ 64.)

Further, Plaintiff alleges that Defendants failed to adequately disclose the unfavorable terms of the amendment to a pellet purchase contract between Sparrows and Cliffs Sales Company ("Cliffs"). (Compl. ¶¶ 54-59.) Subsequent to the closing, Cliffs asserted a claim for breach of contract against RG Steel, which proceeded to arbitration. (*Id.* ¶¶ 56-57.) The arbitration panel found in favor of Cliffs and rendered an award against RG Steel for $18,963,465.40 in damages, plus $1,524.53 in daily interest and $7,127.18 in arbitration fees. (*Id.* ¶¶ 54-59.) Plaintiff contends that Defendants also failed to disclose ten additional Material Contracts pursuant to which Sparrows was obligated to sell tin plate to third parties at prices below the cost of production. (Compl. ¶¶ 66-68.) RG Steel has suffered more than $38 million in losses as a result of these agreements. (*Id.* ¶ 69.)

12

Finally, Plaintiff maintains that Defendants failed to disclose the existence of changes to their practices occasioned by the Coke Supple Agreements and the 2010 Transportation Contract.  (Compl. ¶ 70.)  Pursuant to Section 2.15 of the SPA, Defendants represented and warranted that:

> Except as set forth in Schedule 2.15, since September 30, 2010 to the date of this Agreement: (i) the Business has been conducted in the ordinary course consistent with prior practices; . . . (x) neither the Company nor any of its Subsidiaries has amended, terminated, cancelled or compromised any material claims or waived any other rights of substantial value; . . . (xvi) neither the Company on [sic] any of its Subsidiaries has modified in any material respects its payment practices with any of its material suppliers.

(*Id.* ¶ 71.)  Defendants purportedly violated this provision by failing to disclose that (1) Sparrows materially modified its payment practices under the Coke Supply Agreements in the January 31 Letter (*Id.* ¶¶ 42-53), and (2) pursuant to the 2010 Transportation Contract, Sparrows materially modified its payment practices with Norfolk Southern.  (*See id.* ¶¶ 60-65.)

4. Covenants

13

Article IV of the SPA is titled "Covenants and Agreements."  Section 4.14 sets forth a number of covenants regarding the termination of intercompany agreements, which are pre-existing agreements between Severstal entities that would remain with Severstal, on the one hand, and those that were sold to RG Steel, on the other hand.  Section 4.14(d) obligates RG Steel to cause its subsidiary Sparrows Point to repay to Severstal's affiliates all outstanding intercompany trade payables in an amount not to exceed $36 million "[o]n or prior to the first anniversary of the Closing Date."  (*Id.* § 4.14(d).)

**The Applicable Standard**

In considering a motion to dismiss pursuant to Rule 12(b)(6), the Court construes the complaint liberally, accepting all factual allegations as true and drawing all reasonable inferences in the plaintiff's favor.  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

14

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).  Plaintiffs must allege sufficient facts to "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Cohen v. Stevanovich*, 772 F. Supp. 2d 416, 423 (S.D.N.Y. 2010).  Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 555).

"Under New York law . . . judgment as a matter of law is appropriate if the contract is unambiguous.  Contract language is unambiguous when it has a definite and precise meaning, unattended by danger of misconception in purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Photopoint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003) (internal

15

citations omitted); *see also Crane Co. v. Collec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999) ("If the parties' intent is unambiguously conveyed by the plain meaning of the agreements, then interpretation is a matter of law."). It is black letter law that "[a] contract should be construed so as to give full meaning and effect to all of its provisions," and "[r]ather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement." *Am. Express Bank v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (N.Y. Sup. Ct. 1990).

## I. **Defendants' Motion to Dismiss is Granted**

Severstal has moved to dismiss the First Cause of Action in part, and the Second Cause of Action in its entirety, for failure to state a claim.

1. Because Plaintiff fails to Allege that the 2010 Transportation Contract Gives Rise to a Loss, Allegations as to That Contract in Plaintiff's First Cause of Action are Dismissed

Defendants move to dismiss the portion of RG Steel's First Cause of Action relating to the 2010 contract with Norfolk Southern, (the "2010 Norfolk Southern Transportation Agreement") which Plaintiff alleges Defendants failed to disclose resulting in a loss of $1,425,450.

16

Both parties agree that Defendants disclosed a transportation agreement between Severstal Warren and Norfolk Southern Railway dated February 9, 2007 (the "2007 Norfolk Southern Transportation Agreement"). (Compl. ¶ 60.) This agreement has a 15 year term (through 2024) and required Severstal Warren to transport with Norfolk Southern no less than 215,000 tons of coke per year from a coke plant located in Haverhill, Ohio. (*Id.* ¶ 61.) Severstal Warren failed to ship a certain 215,000 tons under the 2007 Norfolk Southern Transportation Agreement, which gave rise to a $1,425,540 liability. (*Id.* ¶ 62.)

Severstal Warren subsequently entered into the 2010 Norfolk Southern Transportation Agreement, which provides that Norfolk Southern will forgo collection of the $1,425,450, and Severstal Warren shall instead ship the missed 215,000 tons in 2024 (in addition to the original tonnage for 2024). (*Id.* ¶¶ 64-65.) According to RG Steel, Severstal's failure to disclose the subsequent 2010 Norfolk Southern Transportation Agreement, "that obligated Severstal Warren, LLC to pay the Accrued Liability," by increasing the required tonnage in a post-closing liability, rather than a pre-closing $1,425,450 Accrued Liability as assessed under 2007 Transportation Contract, was a material breach under § 2.16. (*Id.* ¶ 65.)

17

In § 2.16 of the SPA, Severstal represented and warranted that Schedule 2.16 contained an accurate list of all "Material Contracts," which include:

> (e) any agreement, commitment or other Contract relating to Indebtedness of the Company or a Subsidiary thereof in an amount in excess of $1,000,000;

> (i) any agreement, invoice, purchase order or other arrangement with any supplier or for the furnishing of services under the terms of which the Company or any of its Subsidiaries (i) is likely to pay or otherwise give consideration of more than $1,000,000 in the aggregate during the calendar year ending in December 31, 2011 or any calendar year thereafter or (ii) is likely to pay or otherwise give consideration of more than $5,000,000 in the aggregate over the remaining term of such agreement, in each case, that is not otherwise included under Section 2.16(d);

> (j) any agreement, invoice, sales order or other arrangement for the sale of inventory or for the furnishing of services by the Business that (i) is likely to involve consideration of more than $1,000,000 in the aggregate during the calendar year ending in December 31, 2011 or any calendar year thereafter or (ii) is likely to pay or otherwise give consideration of more than $5,000,000 in the aggregate over the remaining term of such agreement, in each case, that is not otherwise included under Section 2.16(d).

(SPA §§ 2.16 (e), (i), and (j); Compl. ¶ 41.)  In Section 8.02, Severstal agreed to indemnify RG Steel for "Losses suffered, incurred, or sustained by [RG Steel] by reason of or resulting

18

from (i) any inaccuracy or breach of a representation or warranty of [Severstal] . . . ." (SPA § 8.02.)

RG Steel has sufficiently alleged that the 2010 Norfolk Southern Transportation Agreement was a "Material Contract," in that it was an "agreement . . . for the furnishing of services by the Business" with consideration exceeding "$1,000,000." (*See* SPA § 2.16(j).)  However, the claimed $1,425,450 liability results from the 2007 Norfolk Southern Transportation Agreement, which was disclosed, not from the 2010 Contract.  The 2010 Norfolk Southern Transportation Agreement does not give rise to the loss, but provides that Norfolk Southern "shall forgo collection" of the pre-existing $1,425,450 obligation provided that Severstal Warren will ship the 215,000 tons at issue in 2024.  (*Id.* ¶ 64.)  That the obligation was altered from a pre-closing liability to a post-closing liability does not change the fact that the underlying liability is not the result of "any inaccuracy or breach of a representation or warranty of [Severstal]," (*see* SPA § 8.02), but rather was disclosed by Defendants in the 2007 Transportation Contract.  RG Steel therefore fails to plead a loss related to the 2010 Norfolk Southern Transportation Agreement, and Plaintiff's allegations as to that contract are dismissed.

19

2. Plaintiff has not Alleged a Change in Payment Practices with Respect to the Coke Supply Agreements or the 2010 Norfolk Southern Transportation Contract

Plaintiff's Second Cause of Action alleges that a letter regarding the pricing of the Coke Supply Agreements and the 2010 Norfolk Southern Transportation Agreement, both of which Defendants failed to disclose, constituted changes in payment practices in breach of the representation and warranty in § 2.15 of the SPA.  (SPA § 2.15.)

Pursuant to Section 2.15 of the SPA, Severstal represented and warranted to RG Steel that between September 30, 2010, and March 1, 2011, there was an absence of certain changes in its business, specifically that,

> (i) "the Business has been conducted in the ordinary course consistent with prior practice" and (xvi) "neither the Company or any of its Subsidiaries has modified in any material respects its payment practices with any of its material suppliers."

(SPA § 2.15(a) (i) and (xvi).)  Plaintiff contends that on January 31, 2011, Defendants received a letter modifying the payment provisions of the Coke Supply Agreements. (Compl. ¶ 50) The Coke Supply Agreements are grounded in a Service Provision Agreement, which provides that,

> Upon delivery of the Sparrows Point Coke to the
> Delivery Point (as defined in the Coke Supply
> Agreements) relating to the Sparrows Point facility,
> (i) Recipient [Severstal Sparrows Point LLC] shall
> notify Provider [ArcelorMittal] in writing of the
> occurrence of such delivery, [and] (ii) Recipient
> shall pay Provider in all cash amounts owed by
> Provider for the Sparrows Point Coke pursuant to the
> applicable Coke Supply Agreement. . . .

(Compl. ¶ 49.)  Although Defendants disclosed the existence of

the Coke Supply Agreements, Defendants did not disclose a

January 31, 2011 letter from ArcelorMittal to Severstal N.A., in

which the favorable fixed price provision had been removed and

the price to be paid by Severstal Sparrows Point LLC had been

increased, equating to an aggregate price increase of $80.7

million over the term of the contracts.  (Compl. ¶¶ 50-51.)  In

addition, "in or about December 1 2010," Severstal entered into

the 2010 Norfolk Southern Transportation Agreement, which

transformed a pre-closing Accrued Liability into a post-closing

obligation to transport an additional 215,000 tons of coke with

Norfolk Southern.  (Id. ¶¶ 63-64.)  The Complaint alleges that

both the January 31 letter and the 2010 Norfolk Southern

Transportation Agreement materially changed Defendants' payment

practices in breach of § 2.15.


These assertions, though, are the same as those

supporting Plaintiff's claims in its First Cause of Action for

21

Severstal's purported breach of its representations and
warranties under Section 2.16 of the SPA.   (Id. ¶¶ 44- 53, 87.)
RG Steel does not plead new facts supporting its claims in the
Second Cause of Action, but merely incorporates the paragraphs
in its Complaint pertaining to its Section 2.16 claims in
its First Cause of Action. (Id. ¶ 72.)   To be meaningful,
Sections 2.15 and 2.16 must constitute representations and
warranties about different conduct.   *See, e.g., Muzak Corp. v.
Hotel Taft Corp.*, 1 N.Y.2d 42, 46-47 (1956) ("The rules of
construction of contracts require us to adopt an interpretation
which gives meaning to every provision of a contract or, in the
negative, no provision of a contract should be left without
force and effect.") (citing 1 Restatement, Contracts, § 235,
subd. [c]).   Section 2.15 is not applicable to an alleged
failure to disclose Material Contracts, but rather contains only
representations and warranties that Severstal would not
materially change certain business and payment practices.
Plaintiff does not anywhere plead how the alleged failure to
disclose the amendments to the Coke Supply Agreements and 2010
Norfolk Southern Transportation Agreement constitutes such a
breach of the representations and warranties in Section 2.15 (i)
and (xvi), and is not a mere failure to disclose a material
contract under § 2.16. (Compl. ¶¶ 96-97; *see also id.* ¶¶ 70- 72)

22

Because Plaintiff does not allege facts in support of
its claim under Section 2.15 other than those that allege a
claim for failure to disclose Material Contracts pursuant to
Section 2.16, Plaintiff's Second Cause of Action is dismissed as
to both the Coke Supply Agreements and the 2010 Norfolk Southern
Transportation Contract.[1]

## II.  Plaintiff's Motion to Replead is Denied

In the event RG Steel's allegations are found
insufficient, Plaintiff requests leave to amend its dismissed
claims.

Absent undue delay, bad faith, undue prejudice, or
futility, the "mandate" under Rule 15(a)(2) to freely grant
leave to amend "is to be heeded." Foman v. Davis, 371 U.S. 178,

---

[1] In further support, Defendants contend that § 4.01 of the SPA, which sets
forth Severstal's covenants during the time between the execution of the SPA
and closing, demonstrates that § 2.15 does not provide for mere failures to
disclose Material Contracts.  Section 4.10 contains a covenant that the
Company shall "not enter into, materially amend or terminate any Material
Contract, or waive any material right thereunder."  (SPA § 4.10(k).)
According to Defendants, if the language in Sections 4.10(a) and (r), which
is identical to the language in Sections 2.15 (i) and (xvi), included
representations and warranties related to the disclosure of Material
Contracts, then it would have been unnecessary to include provision (k) in
Section 4.10, showing that Section 2.15 (i) and (xvi) did not include
representations and warranties related to disclosure of Material Contracts.
(Defendants Memorandum in Support of Motion to Dismiss, "Def. Mem."; at 20
(citing Muzak Corp. v. Hotel Taft Corp., 1 N.Y.2d 42, 46-47 (1956) ("The
rules of contruction of contracts require us to adopt an interpretation which
gives meaning to every provision of a contract or, in the negative, no
provision of a contract should be left without force and effect.")).)

182 (1962); see also AEP Energy Servs. Gas Holding Co. v. Bank
of Am. N.A., 626 F.3d 699, 725 (2d Cir. 2010) ("'The rule in
this Circuit has been to allow a party to amend its pleadings in
the absence of a showing by the nonmovant of prejudice or bad
faith.'") (quoting Block v. First Blood Assocs., 988 F.2d 344,
350 (2d Cir.1993)).


        This case has been pending since April 2012 and
discovery has yet to begin.  A second amended complaint would
cause no material delay in the resolution of this case.
However, amendment would be futile.  Plaintiff's claims fail on
the plain language of the SPA, which is unambiguous and
conclusive.  Plaintiff has not cited any additional facts it
would plead to overcome the provisions of the contract, but
rather states that "any amendment would simply offer clarity on
the issues discussed in this motion."  (Pl. Opp. at 19-20.)  As
such, Plaintiff's request for leave to amend the dismissed
claims is denied.


**Conclusion**


        Based upon the conclusions set forth above,
Defendant's Motion to Dismiss is granted: Plaintiff's First
Cause of Action with respect to the 2010 Transportation

24

Contract, and Second Cause of Action in its entirety, are
dismissed.


It is so ordered.

**New York, NY**
**January ϟϟ, 2014**

_____
ROBERT W. SWEET
U.S.D.J.